George S. Bennett et al. *v.* Patrick T. Norton, Thomas M. Dullard and Thomas Smith, Commissioners of Luzerne County, Appellants.

|171  221|
|195  514|

171      221
202    ³347

|171   221|
|408(³317|

*Counties—County commissioners—Erection of courthouse—Act of April* 15, 1834, *and act of June* 1, 1883.

Prior to the act of June 1, 1883, P. L. 58, the county commissioners had discretionary power to buy land, if need be, upon which to erect a new courthouse recommended by two successive grand juries, although the grand juries in their reports did not expressly mention the purchase of land.

The act of June 1, 1883, superseded the provisions of section 10 of the act of April 15, 1834, P. L. 539, in this particular, and was intended to furnish not only a complete but an exclusive method for the acquisition of land by the county for the purposes named in the act.   Hence, to give the county commissioners authority to buy land, or to take land by condemnation proceedings, upon which to erect a new courthouse, there must be the reports of two successive grand juries "that the necessities of the county requires ground at the county seat for the purpose of erection."

The provisions of the act of June 1, 1883, so far as they relate to the powers of the county commissioners to purchase land for a courthouse are constitutional, although by a proviso the act did not originally apply to counties containing cities coextensive with the county.

Argued April 19, 1895.   Appeal, No. 458, Jan. T., 1895, by defendants, from decree of C. P. Luzerne Co., Oct. T., 1894, No. 14, on bill in equity.   Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and MITCHELL, JJ.   Affirmed.

Bill in equity to restrain the purchase of land and the erection of a courthouse.

The facts appear in the following opinion by RICE, P. J.

This is a bill in equity, filed by resident taxpayers and owners of real estate in the city of Wilkes-Barre, to restrain the county commissioners from purchasing certain land described in the bill, or any other land for the purpose of erecting a courthouse thereon, and from expending, or contracting to expend, the moneys of the county for that purpose, i. e., the purchase of land.

Each of the two successive grand juries, the first at January and the second at April sessions, 1894, recommended the erection of a new courthouse in the city of Wilkes-Barre.   The second report reads as follows :

" That having carefully made personal inspection of the present courthouse, the several offices therein, and the conveniences and suitability thereof for the transaction of business, and having duly heard testimony thereon, beg leave to recommend and find as follows :

" First. That the present courthouse does not afford proper and suitable offices for the accommodation and transaction of the public business ; that there is no suitable controller's office, no superintendent's office, unsuitable water closets, and inconvenient arrangements of the courtrooms, and that nearly all the rooms are too small for the purposes intended.

" Second. That the grand jury recommend that the county commissioners of the county of Luzerne cause to be erected in the city of Wilkes-Barre a new courthouse suitable for the accommodation of the courts and of the county, and for the reception and safe-keeping of the records and other papers in charge of such officers; that further repairs to the present courthouse are, in the opinion of the grand jury, inadvisable, and that the erection of a new, suitable fire-proof building, as hereinbefore recommended, is the best economy under the circumstances."

On April 25, 1894, the court approved the two reports.

The question for our decision is, whether these reports, and the approval thereof by the court, are sufficient to vest in the county commissioners authority to purchase land on which to erect the proposed new courthouse. The expediency of erecting it elsewhere than on the public square of the city of Wilkes-Barre, or of erecting on the peculiar site selected by the county commissioners, has naught to do with the proper solution of the legal question above stated. It cannot properly, nor will it, in fact, enter into our decision. As we view the case, it turns on the construction of the act of 1834, and act of 1883, and not upon any facts in our local history or growing out of the local legislation. Nevertheless, in order that all of the questions may be properly presented for review, we find the following facts :

First. The purchase of the Indian title within the supposed charter limits of the colony of Connecticut, on the waters of the Susquehanna, by the Connecticut-Susquehanna Company in 1754, included what was afterwards constituted the town, and later the county of Westmoreland, under the political jurisdiction of Connecticut, within which were the various townships (of which Wilkes-Barre was one). These townships had power to make needful rules and by-laws for their interior regulation, the establishment of roads, the care or disposal of vacant lots, and other matters entirely local. The township of Wilkes-Barre was first surveyed by David Meade in 1770. In 1773 a final division was made of the back lots, and the town plot, afterwards the borough of Wilkes-Barre, was laid out. Two hundred acres were divided into eight squares of twenty-five acres, and these into six lots each, containing, after the

streets were laid off, about three and three fourths acres. A spacious central square was allotted for public buildings, and on the bank of the river a wide space was left as a common. (See further Miner's History of Wyoming.) In short, prior to the erection of the county of Luzerne and prior to the acquisition of the title from Pennsylvania under the compromise acts, " Centre Square," as it was then called, was dedicated to the public, for the uses specified, in so far as it could be dedicated by the proprietors and settlers under the Connecticut title; but we are not prepared to say that its use as a site for a courthouse was not originally contemplated.

Second. On May 10, 1804, the commissioners appointed to put in execution the act of April 4, 1799, 3 Sm. L. 362, entitled " An act for offering compensation to the Pennsylvania claimants of certain lands within the seventeen townships in the county of Luzerne," and the supplements thereto passed March 15, 1800, 3 Sm. L. 435, and April 6, 1802, 4 Sm. L. 526, issued a certificate to a committee of Wilkes-Barre township for a plot of land designated as " Centre Square," containing four acres and forty-one perches. By the act of March 17, 1806, 8 Sm. L. 106, the town plot of Wilkes-Barre and its vicinity was erected into a borough. On February 8, 1869, the town committee conveyed " Centre Square " to the borough of Wilkes-Barre, and in 1870 a patent issued from the commonwealth.

Third. The county of Luzerne was organized on May 27, 1787, pursuant to the provision of the act of September 25, 1786, 2 Sm. L. 387, entitled " An act for erecting the northern part of the county of Northumberland into a separate county." Sections four and nine of said act provided as follows:

"Section 4. That courts of common pleas and general quarter sessions of the peace, to be holden in and for the said county of Luzerne, shall be opened and held . . . . and shall be held at the house of Zebulon Butler, in the town of Wilkesburg, in the said county of Luzerne, until a courthouse shall be built, as hereafter directed, in the said county, which said courts shall then be holden and kept at the said courthouse on the days and times before mentioned.

" Section 9. That Zebulon Butler, Nathaniel Landon, Jonah Rogers, John Philips and Simon Spaulding are hereby appointed trustees for the said county of Luzerne, and they or any three

of them shall take assurances of and for a piece of land, situate in some convenient place in or near Wilkesburg, within the said county of Luzerne, for the seat of a court house and of a county gaol or prison for the said county, in the name of the commonwealth, in trust and for the use and benefit of the said county of Luzerne, and thereupon to erect a court house and prison, sufficient to accommodate the public service of the said county."

Fourth. The commissioners appointed as aforesaid located the first courthouse in the public square above referred to. This building, which was a log structure about twenty-five by fifty feet in size and two stories high, was completed in 1791. In 1801 Lawrence Myers, Eleazer Blackman and Thomas Wright, county commissioners,. procured the plan of a new courthouse. The old log building was removed, but continued to be occupied by the courts until 1804, when the new building, which was erected on the site of the log courthouse, was completed. This was succeeded by the present structure, the corner stone of which was laid on August 12, 1856.

Fifth. Sections three and four of the act of May 5, 1855, P. L. 443, entitled "An act relating to the borough of Wilkes-Barre," provided as follows: "Section 3. The said council are hereby empowered and required to issue bonds in form, amounts, and with interest and payable as aforesaid, to an amount not less than ten thousand dollars, and not greater than twenty thousand, which bonds may be delivered to the treasurer of Luzerne county, the same to be applied toward payment of cost of erecting a new court house and public offices in said borough, one-half the amount of said bonds to be paid into the treasury when the buildings shall be half completed: Provided, That said court house shall be erected in the centre of the square of said borough. And also provided, That said councils and commissioners of said county may at any time cause buildings now on the square to be taken and removed, and after the erection of the new buildings they shall cause all others to be removed.

"Section 4. That the said council is hereby empowered to levy such additional taxes on the property now taxable under existing laws in said borough, as may be required from time to time to meet the interest and principal of the said bonds as they may respectively fall due."

A supplement to the foregoing act, approved April 2, 1856, P. L. 225, provided: " That the commissioners of the county of Luzerne may locate the new court house about to be erected in the borough of Wilkes-Barre in or near the centre of the public square of said borough as they may consider proper and desirable."

Section 4 of the act of March 27, 1865, P. L. 800, entitled " An act to authorize the commissioners of Luzerne county to build a new county jail and perform other acts," provides as follows : " That the said county commissioners are hereby authorized and empowered to take charge of the public square in the borough of Wilkes-Barre, the same on which the court house of said county now stands, build a fence around the same, lay the same with suitable walks, and set it out with trees, shrubbery ; and the expense therefor to be paid by them, by orders drawn on the county treasury." Section five of the same act conferred the powers and authority of policemen upon the county commissioners and their clerk and janitor, for the arrest of persons committing any nuisance or trespass in or about the courthouse or the public square ; prescribed penalties for such nuisance or trespass and the procedure for the collection of the same.

Pursuant to the provisions of the act of 1855 the borough council, on December 13, 1855, passed a resolution to issue six per cent bonds to the amount of twenty thousand dollars, payable in twenty years, and to deliver the same to the county treasurer, etc., and to appoint a committee to consult with the county commissioners concerning the construction, completion, etc., of the courthouse, with the consent of the commissioners. The minutes of council show that on January 19, 1856, a resolution of the county commissioners was filed, accepting the issue of bonds. Pursuant to these resolutions, borough bonds were executed and delivered to the county treasurer, as follows: December, 1856, $5,000 ; February, 1857, $5,000 ; October, 1866, $10,900 ; " which " (to quote from the minutes) " the county commissioners have agreed to accept in full."

Alterations have been made in the present structure from time to time, but it is not essential to the determination of any question raised in this case to refer to them.

It is a fact of historical interest, if not of legal value, that

from 1779 to 1782, when the decree of Trenton put an end to the jurisdiction of Connecticut, the courts of Westmoreland county were held within Wilkes-Barre fort, erected in the public square. (Pearce's Annals of Luzerne. See also paper of Mr. Sheldon Reynolds, president of the Wyoming Historical and Geological Society, read before that society on December 21, 1894.)

Having stated all the facts that can have any bearing on the case, we proceed to a consideration of the legal questions.

It is argued that the erection of the present courthouse in the public square, pursuant to the acts of 1855 and 1856, and the issue of bonds by the borough, and payment of taxes by property owners of the borough, constituted an executed contract, entered into by sanction of the legislature, conferring vested rights on the property owners of the borough, which cannot be divested by the county authorities acting under the general law of 1834 relating to the construction of county buildings, nor under any other act not providing for compensation to the property owners of the borough and a method of condemnation for the benefit of the county of the rights of such property owners. The contract, if there was one, would be expressed in these words: " The borough will contribute twenty thousand dollars towards the cost thereof in consideration of the county erecting a new courthouse in or near the center of the public square." Each party literally performed its part of the contract when the courthouse was erected and the money was paid. It was then an executed contract in the sense that nothing remained to be done, but not in the sense that the borough thereby acquired a vested right to have the courthouse forever remain on the public square. Both acts refer to the courthouse about to be erected, and not expressly nor impliedly to the permanent and irrevocable selection of the site of the county courthouse. Not to stick too close to the letter of the law, the legislature contemplated, not only the . erection of a new courthouse in the public square, but its use by the courts and the county officers for the purposes of its erection. Looking at it in the light of a contract, this was to be implied as part of the consideration. If more had been intended it would have been expressed. But there is no express condition, nor can it be implied reasonably, that the

courthouse then erected should be forever maintained even after it ceased to be safe or adequate, or that the public square should be for all time the site of any county courthouse that might in the future be erected. Assuming that, in the judgment of those in whom the legislature has vested the discretionary power to decide, it is necessary to erect a new courthouse upon a different site, there is nothing in the provisions of the acts of 1855 and 1856, or in the action of the borough pursuant thereto, which prevents the exercise of that power.

The relevancy of the facts stated in findings first and second, if they are relevant to the present inquiry, is to base an argument that the public square was dedicated to the use of the whole public; that the county was originally a trespasser, and could not by user, however long continued, or even by consent of the municipal authorities, acquire a right, as against the public, to erect and maintain a courthouse thereon; therefore the county must purchase land, if the recommendation of the grand jury is to be carried out, and authority so to do must be implied. This argument involves two propositions: first, that the county has no right to use the public square for a courthouse; second, that the grand jury knew it. While we do not deem it necessary to a proper disposition of this case to discuss, or determine, the right of the county to have the courthouse in the public square, we are not prepared to concede that it has no such right. See Com. v. Bowman, 3 Pa. 202. It is sufficient for the present to say that it has never been judicially determined that the courthouse is an unlawful encroachment thereon, and after the lapse of a century, during all which time the public square has been continuously used as the site of the county courthouse, it would be a rash presumption to hold that the grand jury must, of necessity, have assumed that the county would have no right to erect the new courthouse in the same place. If the county commissioners have not authority to purchase land without the approval of the grand jury, the report ought to show expressly, or by necessary inference, that the grand jury considered the question. Hence we held on the trial that it could not be impeached or helped out by the testimony of members of the grand jury that the question was, or was not, considered. The report must be self-sustaining, and contain all that is necessary

to vest authority in the commissioners.  The inference from the state of the title to the public square, that the grand jury acted on the assumption that the new courthouse could not be built there, is so contrary to the probabilities that we do not feel warranted in drawing it.  A more plausible inference is, that the grand jury did not pass on the question because they assumed that, under the law, it did not belong to them to decide.

We come, then, to the main and controlling questions in the case; first, as to the construction of the act of 1834; second, as to the construction and validity of the act of 1883.

The tenth section of the act of April 15, 1834, P. L. 539, provides as follows : " It shall be lawful for the commissioners of any county, having first obtained the approbation of two successive grand juries, and of the court of quarter sessions of such county, to cause to be erected, at the seat of justice thereof, when occasion shall require, such building or buildings as may be necessary for the courts and of the several officers of the county, and for the reception and safe keeping of the records and other papers in charge of such officers, and also such other buildings as may be necessary and proper for the purposes of a county jail and workhouse, and, if need be, to purchase ground for the erection of such buildings."   It is argued by the plaintiffs' counsel that the grand jury must report on both questions, namely, the erection of a courthouse, and the purchase of land for a site.   The defendants' counsel contend that the necessity for purchasing a new site is not to be decided by the grand jury ; that if two successive grand juries recommend the erection of a new courthouse, without saying anything as to the site, and the court approves the reports, the authority to purchase land, if in the discretion of the county commissioners it is necessary in order to carry out the recommendation of the grand jury, follows as a matter of course.   The question is not free from difficulty, but, speaking for myself alone, I am inclined to think that the latter is the proper construction.   It seems to me quite as natural as the former, and is in harmony with the opinion expressed in Northampton Commrs.' Appeal, 57 Pa. 452.   The precise question before the Supreme Court was as to the power of the quarter sessions to suspend or reverse its approval of the reports of two successive grand juries recommending the erec-

tion of a new jail, and it was decided that it had not such power. The validity of contracts made or proposed to be made by the county commissioners in carrying out the recommendation of the grand jury was not directly before the court; but in determining the power of the quarter sessions to revoke its approval, the authority of the commissioners to make such contracts and the effect of holding that the court could, at any time, revoke its approval were questions, which, properly, if not necessarily, were considered. Judge SHARSWOOD pertinently asks: " If such a power to withdraw the approval of the court may be lawfully exercised, up to what period may it be; what is its effect upon contracts made by the commissioners under the authority of the previous action for the purchase of a site and for the erection of a building?" Furthermore, it is evident that these questions were carefully considered, and even if the opinion of the court upon them is not of binding authority, it is entitled to great weight. After reviewing all of the prior legislation on the subject, Justice SHARSWOOD quotes the tenth section of the act of 1834, and then says: " In pursuance of the provisions of this act . . . . the grand jury made a report " recommending that a new jail should be built so as to accommodate the wants of the county and employ the prisoners." This report was read, approved by the court, directed to be filed, a copy of the same given to the county commissioners, and published. At the next succeeding term in January, 1867, the grand jury made a similar report and recommendation, which was in like manner approved, directed to be filed and published. The authority was thus completely vested in the commissioners, pursuant to the act of assembly, to purchase a site and erect a new jail, if indeed it was not their duty to do so. In Sharp v. Wike, 8 Cent. Rep. 222; 9 Atl. R. 454, it was held that the recommendation of two successive grand juries duly approved by the court of quarter sessions that a new jail should be erected is not defeated by the fact that one grand jury coupled with its recommendation a direction to the county commissioners to purchase a new site, " for two reasons " (quoting from the opinion of the Supreme Court), " the one is that it is a distinct matter which may be separated from the former; the other is that it is an attempt to restrict the discretionary power of county commissioners as to the specific location, which is not warranted

by the statute. It may, therefore, be treated as surplusage."
It is true the county commissioners decided to build on the old
site : hence the question of their power to change the site, and
to buy land was not necessarily raised. But if the plaintiffs'
construction of the section is correct, how could it be said that
the county commissioners had a discretionary power? But it
would seem from the above quoted language of the court that
they had such power vested in them by the statute, independ-
ently of any action of the grand jury as to the site, else the
decision of the case would have been rested upon the first reason
assigned by the court, which was entirely sufficient for the pur-
pose. As the senior counsel for the defendants well says : "A
discretionary power involves an alternative power, i. e., a power
to do or refrain from doing a certain thing." If the county
commissioners had, under the statute, the discretionary power
to decide as to the site, and if the grand jury could not restrict
the exercise of that power by recommending that a new site be
chosen for the proposed building, could they control it by with-
holding any recommendation on the subject? As the law stood
prior to the act of 1883, I am inclined to think they could not,
and therefore would hold that if that act has not superseded
the tenth section of the act of 1834, the county commissioners
would have discretionary power to buy land, if need be, for the
proposed new courthouse.

The act of June 1, 1883, P. L. 58, so far as material here,
provides as follows : " That it shall be lawful for the county
commissioners of any county, on the report of two successive
grand juries, heretofore or hereafter to be made, and the ap-
proval of the same by the court of quarter sessions of such
county, that the necessities of the county require ground at
the county seat for the purpose of the erection or extension of
such building or buildings as may be necessary for the accom-
modation of the courts, and of the several officers of the county,
and for the reception and safe keeping of the records and other
papers in charge of such officers, and also such other building
or buildings as may be necessary and proper for the purposes
of a county jail or workhouse, or any or either of them, to pur-
chase ground for the purposes aforesaid, subject to the approval
of the president judge, or judges of the court of common pleas
of the proper county." The act then goes on to provide for

condemning the land selected by the county commissioners, if they cannot agree with the owner, and to regulate the proceedings. It will be observed that in describing the buildings, for the erection of which land may be acquired, the act of 1883 follows verbatim the language of the act of 1834; but the procedure under the former act differs in essential particulars from that under the latter act. First, there must be a specific report by the grand jury, " that the necessities of the county require ground at the county seat for the purpose of the erection or extension of such building," &c. Second, the county commissioners must obtain the approval of the judges of the court of common pleas of the purchase. Neither of these conditions has been complied with in this case. But it is argued, that, while they may be essential prerequisites to a condemnation of land, they are not to a purchase of land. It is said the act of 1834 was defective in not authorizing the county commissioners to condemn land, and the act of 1883 was passed to remedy this defect; hence it applies only when the county commissioners propose to resort to condemnation. The effect then of the reports of the grand jury was to withhold from the county commissioners an exceedingly valuable power in case they should decide to locate the building on a new site, and to restrict their choice to such land as they could purchase. According to the defendants' construction there are two acts in force regulating the acquisition of land for public buildings; one requiring a specific report of the grand jury that the necessities of the county require ground for such purpose, and the other requiring neither of these things. But how are we to interpret the reports of the grand jury in this case? Have we a right to presume that they ignored the act of 1883, and yet intended to confer authority on the county commissioners to change the site if they thought best? Or are we to presume that they exercised the power which the act of 1883, if valid, clearly gave them? If we are to presume the latter, their omission to report on the subject is equivalent to a report that it is not necessary to purchase or condemn land on which to erect the building. But, as we have said, the reports must speak for themselves; and, not to base an argument on uncertain inferences, suppose the grand juries had considered the question and had expressly reported that it is not necessary to

acquire land.  If, notwithstanding such reports, the county commissioners may still go on and purchase land the provisions of the act of 1883, so far as they relate to that subject, are nugatory.  Such construction is never favored, and if language means anything the legislature intended the act of 1883 to apply to the purchase as well as to the condemnation of land. The whole subject of the acquisition of land for the purposes named in the act was before the mind of the legislature.  Possibly they saw the difficulties in the construction of the act of 1834 to which we have alluded, and intended to remove all doubts as to the conditions upon which it should be lawful for the county-commissioners to act.  At all events they have prescribed a plain method for acquiring land, both by purchase and by condemnation, which is inconsistent with the continued existence of the power to purchase land without the express approval of the grand jury.  It is true, the act does not expressly declare that it shall not be lawful for the county commissioners to purchase land without a specific report of the grand jury that the necessities of the county require it.  But this is implied.  Even where the later statute is in the affirmative, and requires the same and more than a former one prescribed, it is often found to involve a negative and to repeal the earlier act so far as the later renders more necessary than the earlier one prescribed.  Endlich on Interpretation of Statutes, § 199.  In Gwinner v. Lehigh & Del. Gap R. Co., 55 Pa. 126, Judge AGNEW said that " Acts which, although in pari materia grant a right conditioned on different things, are inconsistent, and the inconsistency operates as a repeal."  In general, a subsequent statute revising the whole subject-matter of a former one, and evidently intended as a substitute for it, although it contains no express words to that effect, must, in the principles of law, as well as in reason and common sense, operate to repeal the former: Johnston's Estate, 33 Pa. 511 ; Rhoads v. Hoernerstown B. Assn., 82 Pa. 180; Martz's Election, 110 Pa. 505; B. & L. Assn. v. B. & L. Assn., 159 Pa. 308.  As we have suggested, the act of 1883 applies in terms to the purchase of land ; its provisions, so far as they relate to that subject, would be useless and vain, unless they were intended to remove the ambiguity in the tenth section of the act of 1834, or to provide a substitute for the provisions of that

section relating to the same subject-matter, and it contains internal evidence of being a revision of the law upon the subject. We cannot escape the conclusion that it was intended to prescribe not only a complete but an exclusive method for the acquisition of land for the purposes named in the act.

It is further claimed that the act of 1883 is unconstitutional and void because of the proviso which reads: "That this act shall not apply to counties containing cities co-existensive with the county." The plaintiffs' counsel, while not conceding the unconstitutionality of the law, claim that the defect, if any, was cured by the supplement approved April 26, 1889, P. L. 55, by which, amongst other things, the above quoted proviso was repealed.

Section 7, article III. of the constitution provides: "The general assembly shall not pass any local or special law . . . . regulating the affairs of counties, cities, townships, wards, boroughs or school districts." Unquestionably, the act of 1883 is a law regulating the affairs of counties. Is it a local or special law? It is a fact, of which we may take judicial notice, that Philadelphia is the only city in the state coextensive with the county, and in that city, because of the act of August 5, 1870, erecting the "Building Commission" and other laws, the act of 1883, at least so far as it relates to the erection of a courthouse and purchase of land therefor, would not have applied, even if the proviso had been omitted. But while it may not be probable, it is not impossible that some other city of the commonwealth may become coextensive with the county, and by the proviso such county would be excluded from the operation of the act, and, perhaps, have no local legislation to take its place. A somewhat similar question arose and was considered in City of Wilkes-Barre v. Meyers, 113 Pa. 395. The act of 1879, enlarging the jurisdiction of justices of the peace, contained a proviso that it should not apply to magistrates in cities of the first class. It was claimed that the act violated section 7, article III. of the constitution. TRUNKEY, J., delivering the opinion of the court, said: "If this proviso shall be taken according to the literal meaning of its words the act is void. However, is it not clear that the intention was only to except Philadelphia from the operation of the statute?" Then, after pointing out that Philadelphia was the only city of the first

class, and that the jurisdiction of magistrates in that city was regulated by the constitution, he said: " Were the word Philadelphia in place of the words ' cities of the first class ' there would be no difficulty—in that case there could be no doubt of the constitutionality of the act.    That the legislature intended by the proviso, in pursuance of the constitution, merely to except Philadelphia cannot be doubted.    Surely they did not intend that the act should not apply to cities of the first class, should there be others besides Philadelphia sometime in the future.    They intended to enact law, not to do a vain thing. In the attempt to obey the constitution, and to except Philadelphia out of the statute, they used a periphrasis instead of the proper name, and the phrase, ' cities of the first class ' may not always mean Philadelphia.    Having reference to the constitution, and to prior statutes classifying cities and to the fact that Philadelphia alone is in the first class, can the proviso be construed according to the obvious intent to save the act from being a nullity ? "    After citing certain rules for the interpretation of statutes, he held that it could be so construed.    " Restricting the application of the proviso to the only city in the first class, existing at the date of the act or now, and the act is not a nullity."    The case is not parallel with this in every particular, but it gives some plausibility to the argument that the purpose of the proviso was simply to show that legislation, peculiar to the only city in the commonwealth coextensive with the county, was not intended to be disturbed.    Provisos in different form, but effecting a similar result, have been held to be constitutional: Evans v. Phillips, 117 Pa. 235 ; Commonwealth v. Sellers, 130 Pa. 32; Road in Cheltenham, 140 Pa. 136.    And the objection that the act will cease to operate in counties which, in the future, may have cities coextensive therewith, is no more serious than the objection raised against the act of 1879.    There remains, however, the objection that even if the legislation peculiar to Philadelphia were all repealed, still the proviso, if taken literally, would exclude that county.    It is manifest, also, that in Meyers v. Wilkes-Barre the court felt that they went to the extreme limit in construing the act of 1879 to be valid, and judging from the tenor of the opinion, it is questionable whether they would have gone to that extreme if it had been a statutory provision, which might at any time be

repealed, and not a constitutional provision that legislated the jurisdiction of magistrates in Philadelphia. The case is valuable because it shows the extent to which the courts will go to sustain an act of the legislature, which, perhaps in letter, but not in its true intent and meaning, violates the constitutional provision against special legislation, but it cannot be fairly claimed that it rules the present case. I am disposed to put the decision on the broader ground, which seems tenable under the decisions, that for some purposes, including the regulation of the construction, protection and repair of the public buildings, and the purchase of lands therefor, the legislature may enact a law for a county and city which are coextensive, and a different law for other counties of the state.

Where a city and county are coextensive the affairs of the two are so interwoven that it is neither desirable nor practicable to attempt to separate them and preserve all of the distinctions between the city and the county government that exist and must exist in other counties. Let us suppose that all of local and special laws, relating to Philadelphia, were repealed, would the constitutional provision against local or special legislation prevent the passage of laws which the manifest peculiarities of the county would require, and might not powers and duties as to the erection, protection and repair of public buildings, which in other counties are delegated to county commissioners, be vested in the city government? In such a case could not a law be passed authorizing the erection of a building for the accommodation of the courts and county officers, which is a county affair, and of the municipal officers, which is a city affair, and putting the same, when erected, under the care of the city government or a department thereof? We think this question must have an affirmative answer. Such a law, while relating, it is true, to the affairs of a city and a county, and perhaps to only one city and county of the state, because there would be but one city and county in the class, would not be local or special legislation within the meaning of those terms as they have been defined in many well considered cases. The power of the legislature to classify cities, and within proper limitations to legislate for each class, of necessity includes the power to legislate upon county affairs, where the city and county are coextensive, and their affairs are so

connected that legislation, nominally, for one must affect the other.   This power was exercised in the enactment of the law governing cities of the first class, and so far as the matter under investigation is concerned the validity of its exercise has not been questioned.   Indeed, in Perkins v. Phila., 156 Pa. (at page 560), Judge DEAN said : " By a repeal " (of the act of 1870) " the extraordinary powers of the commissioners would have ended with its own life ; the ordinary powers would have fallen back upon the city to be exercised in the ordinary manner ; the department of public works would have performed such work, and only such, as councils, in the exercise of their paramount ' direction, control and administration ' of municipal affairs might have seen fit to direct."   Again (at page 564), he says: " Under this express constitutional authority " (to repeal local laws) " an act of a dozen lines, repealing the act of 5th of August, 1870, would have ousted the commissioners, and obliterated the commission.   All the rights of the city over its own property, with the control of its own purse, would at once have been resumed.   Then through councils, the direct representatives of the people, by ordinances, city hall would have been completed, the old buildings on Independence Square removed in a time and way and at such cost as to the city seemed proper."   Clearly a law which would vest in the councils of a city coextensive with a county the power to determine the amount to be expended in the erection, furnishing, repairs and care of a building to be used for the accommodation of the courts and the county officers, powers which in other counties are exercised by the county commissioners, would be a law regulating county affairs, and it would make it none the less special to call the building a city building, and the funds used city funds.   The former could with as much propriety be called the county court house, and the latter county funds.   Such a law, while unquestionably regulating county affairs, and operative, possibly, in only one county of the state, would not be a local or special law, but would be justified by the principles of classification.   " Without entering at large upon the discussion of what is here meant by a local or special law, it is sufficient to say that a statute which relates to particular persons or things as a class is a general law, while a statute which relates to particular persons or things of a class

is special, and comes within the constitutional prohibition."
PAXSON, J., in Wheeler v. Phila., 77 Pa. 338.

Not only does this principle apply to classes into which indi
viduals and objects are naturally collected, but it is also held,
within reasonable limitation, to authorize the legislature to
determine and declare the classes to which the objects of leg-
islation belong, and then to legislate for those classes.    This is
held not to be special legislation, but the exercise of a neces-
sary power not taken away by the constitution: Com. v. Reich-
ard et al., 5 Kulp, 540.  "It is admitted that classification,
even where not specifically recognized by nature, custom, the
laws of trade, or the constitution, must in certain cases be
adopted, ex necessitate, as in the case of cities under the act
of May 23, 1874:" McCarthy v. Com., 110 Pa. 243.    But while
Wheeler v. Phila. and other cases recognize the power of the
legislature, they do not sanction classification as a pretext for
special or local legislation.    The idea was clearly expressed by
the present chief justice: "On the contrary, the underlying
principle of all the cases is that classification, with the view of
legislating for either class separately, is essentially unconstitu-
tional, unless a necessity therefor exists—a necessity springing
from manifest peculiarities, clearly distinguishing those of one
class from each of the other classes, and imperatively demand-
ing legislation for each class separately that would be useless
and detrimental to the others:" Ayars' Appeal, 122 Pa. 281.
In Weinman v. Railway Co., 118 Pa. 192, Justice WILLIAMS,
delivering the opinion of the court, said that a law relating to
a class of cities, in order to escape the charge of being a local
law, must "be applicable to all the members of the class to
which it relates, and must be directed to the existence and
regulation of municipal powers and to matters of local govern-
ment."    The failure to recognize the distinction here suggested
has resulted in the passage of many acts applying in particular
classes of municipalities which have been declared unconsti-
tutional upon the ground that, as to the particular subject-
matter there was no necessity for legislation which should not
apply in all of the municipal divisions of the commonwealth.
In other words, they are not classified naturally, nor by law,
for such purposes.    The general doctrine was elaborately dis-
cussed in Ruan St., 132 Pa. 275.    After considering the object

of the classification of cities, Justice WILLIAMS says: "Let us proceed to inquire what kind of legislation is authorized. I reply negatively that it does not authorize legislation on subjects not relating to municipal affairs, . . . . but answering affirmatively, I will adopt the words of the act of 1874 and say that classification authorizes such legislation as relates to the exercise of the corporate powers possessed by cities of the particular class to which the legislation relates, and to the number, character, powers and duties of the officers employed in their management; they are the only purposes for which classification seemed desirable; they are the only purposes for which it has been upheld by this court." Again he says: "We come now to inquire what legislation remains forbidden to cities, notwithstanding classification. I reply that all legislation not relating to the exercise of corporate powers or to corporate officers and their powers and duties, is unauthorized by classification." Further on he enumerates, among the many subjects of legislation which classification presents, "the erection and care of public buildings and other municipal improvements. These are mentioned, not because they include all the subjects for the exercise of municipal powers, but as a suggestion of some of the more obvious ones, and as an illustration of the character of the subjects upon which legislation for the classified cities may be necessary."

These classes are thus seen to embrace; not mere geographical subdivisions of the territory of the state, but organized municipalities, which are divided with reference to their own peculiar characteristics and needs, and the legislation to which they are entitled by virtue of such division is simply that which relates to peculiarities and needs which induced the division. In this way each class may be provided with legislation appropriate to it, without imposing the same provisions on other classes to which they would be unsuitable and burdensome. Adopting the strictest construction that has been put on the constitutional provision, and still it is not clear, if the principle of classification is to be recognized at all, that legislation, such as we have been considering for counties having cities coextensive therewith is prohibited. It seems to me that there is a plain necessity for power so to legislate—a necessity springing from manifest peculiarities, clearly distinguishing

them from other counties, and demanding legislation for each class separately that would be useless and detrimental to the others, if not absolutely incapable of application.    These peculiarities arise in part, but not altogether, from the legislative classification of cities and the laws applicable to cities of the first class.    The very fact that the city and county are coextensive makes legislation necessary concerning local government and the exercise of corporate powers, especially in the acquisition and care of property to be used for the purposes of both city and county, which would be useless and unnecessary in other counties.    If we are correct in the foregoing conclusion, the proviso in the act of 1883 excluding such counties from the operation of a law regulating the powers and duties of county commissioners in the particulars under consideration did not invalidate the law; it is, therefore, unnecessary to consider the effect of the repealing act of 1889.

To recapitulate :

First.  There is nothing in the language of the acts of 1855 and 1856, nor in the action of the then borough pursuant thereto, to prevent the location of the new court house elsewhere than on the public square.

[Second.  As the law stood prior to the act of 1883, the county commissioners would have had discretionary power to buy land, if need be, upon which to erect a new courthouse recommended by two successive grand juries, although the grand juries in their reports did not expressly mention the purchase of land.

Third.  The act of 1883 superseded the provisions of the tenth section of the act of 1834 in this particular, and was intended to furnish not only a complete, but an exclusive, method for the acquisition of land by the county for the purposes named in the act.    Hence, to give the county commissioners authority to buy land, or to take land by condemnation proceedings, upon which to erect a new courthouse, there must be the reports of two successive grand juries "that the necessities of the county require ground at the county seat for the purpose of erection," etc.] [1]

[Fourth.  The provisions of the act of 1883, so far as they relate to the powers of county commissioners to purchase land for a courthouse, are constitutional, although by a proviso the

act did not originally apply to counties containing cities co-extensive with the county.] [2]

[Fifth. Taxpayers of a county can maintain a bill in equity to restrain the county commissioners from expending the money of the county for the purchase of land for the erection of a new courthouse, when such purchase is not authorized in the manner prescribed by the statute; but owners of real estate in the city of Wilkes-Barre, or even fronting on the public square, have no better standing than other taxpayers.

While Judge LYNCH does not assent to all of the foregoing conclusions, and particularly to the construction of the act of 1834, we agree in all of the findings of fact and in the general conclusion that the county commissioners have not authority to purchase land without the approval of two successive grand juries.

[This cause having come on to be heard on bill, answer, and testimony duly taken in open court on the trial thereof on November 1, 1894, and having been argued by counsel and duly considered by the court, it is ordered, adjudged and decreed that the defendants be enjoined from expending, or contracting to expend, the moneys of the county of Luzerne in the purchase of land for the purpose of erecting a courthouse thereon, and that the costs of suit be paid by the county.] [3]

*Errors assigned* were (1–3) portions of opinion as above; (4) in not dismissing bill.

*Alexander Farnham, Joseph Moore* with him, for appellants.

The provisions of the tenth section of the act of 1834, concerning the purchase of land for a new courthouse, are not superseded by the act of 1883, and the method provided by the latter act is an exclusive one: Wood *v.* U. S., 16 Pet. 342; McCool *v.* Smith, 1 Black, 470; Daviess *v.* Fairbairn, 3 How. U. S. 636; Potter's Dwarris on Stat. 155; Wrecks *v.* Downes, 3 Tr. R. 569; Rex *v.* Justices of the Borough of Leicester, 7 B. & C. 6; Goldson *v.* Buck, 15 East, 372; Hand *v.* Fellows, 148 Pa. 456; Hanover Borough's App., 150 Pa. 202; Johnston's Est., 33 Pa. 511; Rhoads *v.* Hoernerstown Bldg. Assn., 82 Pa. 180; B. & L. Assn. *v.* B. & L. Assn., 159 Pa. 308; Gwinner *v.* R. R., 55 Pa. 126.

The act of 1883 is unconstitutional, by reason of its proviso that the act should not apply to counties containing cities coextensive with the county: Davis v. Clark, 106 Pa. 385; Chester County Court House, 7 Pa. C. C. 212; Morrison v. Bachert, 112 Pa. 322; Gildea v. Lack. Co., 5 Pa. C. C. 473; Ruan St., 132 Pa. 257; McCarthy v. Com., 110 Pa. 243; Morrison v. Bachert, 112 Pa. 322; Scales v. State, 47 Ark. 476; Purvis v. Ross, 158 Pa. 20; In re Grant Street, 121 Pa. 596.

A supplement to an act which is amendatory of it is unconstitutional unless the act or section amended is published: Haring v. State, 17 Atlantic Rep. 1079; Scowden's App., 96 Pa. 422.

Under the act of 1834 and the recommendation of the two successive grand juries and the approval of the court of quarter sessions, the county commissioners have discretionary power to buy land, if need be, upon which to erect the proposed new courthouse: Northampton Com. App., 57 Pa. 452; Sharp v. Wike, 8 Cent. Rep. 222; Com. v. Marshall, 3 W. N. C. 182; Com. v. Bowman, 3 Pa. 202.

*H. W. Palmer, G. L. Halsey* and *L. H. Bennett* with him, for appellees.—The provisions of the tenth section of the act of April 15, 1834, P. L. 539, so far as they relate to the purchase of ground for the erection of a new courthouse, are superseded by the act of June 1, 1883, P. L. 58.

The act of 1883 is not unconstitutional by reason of its proviso that the act should not apply to counties containing cities coextensive with the county: Ex parte Doren, 2 Pars. 467; Com. v. Kelly, 5 Kulp, 533; State Trenton Iron Co. v. Yard, 42 N. J. L. 357; McLorinan v. Decker, 42 N. J. L. 603; Sweet v. Syracuse, 129 N. Y. 316.

But even assuming that the act of 1883 had never been passed, or that it is a dead letter, the act of 1834 does not authorize the county commissioners to buy land on the mere recommendation of two grand juries, approved by the court of quarter sessions, that a new courthouse is required.

PER CURIAM, October 7, 1895:

The facts of this case, together with the questions involved, are so clearly and fully presented in the exhaustive opinion of the learned president of the court below, that further elaboration

is unnecessary. While there appears to have been some difference of opinion as to the construction of the tenth section of the act of 1834, the learned judge says : " We agree in all the findings of fact and in the general conclusion that the county commissioners have not authority to purchase land without the approval of two successive grand juries." Assuming, therefore, the correctness of the findings of fact, we have considered all the questions necessarily involved, and are fully satisfied that the general conclusion unanimously reached by the court, as above stated, is entirely correct. That necessarily requires an affirmance of the decree, and renders any expression of opinion as to minor questions unnecessary.

Decree affirmed and appeal dismissed with costs to be paid by appellants.