## Commonwealth v. Briggs

*Harry Shapiro,* for city treasurer.
*Bernard A. Illoway,* for defendant.

KUN, J., December 2, 1938.—Defendant appealed from his conviction by a magistrate for violation of the Act of July 2, 1937, P. L. 2821, which makes it unlawful for any person to advertise or hold out by any means that any sale of goods, wares, and merchandise is a "closing out" sale unless a license is first obtained from the city treasurer to conduct such a sale.

Under the terms of the act, an applicant for a license thereunder must disclose under oath the true name of the owner of the goods to be offered for sale, the name of the operator of the sale, a full and complete inventory of the quantity, kind, and character of the goods to be offered for sale, the method by which the owner of the goods acquired title to the same, and the reason for the urgent disposal thereof. A penalty of $100 fine, or 30 days' imprisonment, is imposed upon any person conducting or being responsible for any such sale, who makes or who is responsible for any misrepresentation in connection with the goods so offered for sale.

On May 7, 1938, defendant, Henry J. Briggs, as treasurer of Blaylock & Blynn, Inc., applied to the city treas-

urer, under the act, for a license to conduct a "going out of business" sale at 1702 Walnut Street, Philadelphia. The license granted was subsequently revoked by the city treasurer, and because defendant continued ostensibly for the corporation to conduct the "going out of business" sale after such revocation, this prosecution was instituted against him for conducting such a sale without a license.

In the meantime, Blaylock & Blynn, Inc., filed a bill in equity in Court of Common Pleas No. 6, June term, 1938, no. 2648, against the city treasurer and other officials seeking to enjoin them from in any way interfering with the conduct of the sale, and from seizing the license or revoking the same. The matter was heard by Judge Lamberton, of Court of Common Pleas No. 5, sitting in summer court on July 22, 1938, and in consideration of the fact that the license which had been issued would by its terms expire on August 10th, so that the question involved thereafter would be moot, he refused to issue a preliminary injunction against the city treasurer and other defendants, and while making the casual comment that he thought the act in question is unconstitutional, added that "probably the best way to test the constitutionality of the act would be by an appeal from a fine imposed under section 4 thereof." It is precisely in that way that the matter is before us now.

We are well satisfied that the act is a piece of salutary legislation and it is constitutional.

"The prevention of fraud and deceit, cheating and imposition, is . . . within the [police] power, and a state may prescribe all such regulations as, in its judgment, will secure or tend to secure the people against the consequences of fraud": 6 R. C. L. 208, sec. 202.

We heartily approve the statement of Mr. Justice Knight of the Supreme Court of Alabama in the recent case of State v. Kartus, 230 Ala. 352, 355, 162 So. 533, upholding a similar act:

"It is not a violation of either the Federal or State Constitution [and it would not be of our State Constitution] to prohibit a person from misrepresenting what he has to sell in order to impose upon purchasers, even if the subject of the sale is an article just as good as the one it is represented to be"; and we adopt the further comment of the learned justice as applying to the matter before us, to wit:

"The prohibition or regulation 'touches no honest man or honest act, but merely restrains the practice of fraud in order to protect purchasers who buy on the strength of representations made and are entitled to what they pay for'."

Other cases upholding this type of legislation are In re West, 75 Cal. App. 591, 243 Pac. 55, Shelnutt v. City Council of Augusta, 163 Ga. 502, 136 S. E. 446, State ex rel. v. Mizell, etc., 106 Fla. 65, 142 So. 824, and People ex rel. v. Jenkins, etc., 202 N. Y. 53, 94 N. E. 1065.

As stated in our own case of Commonwealth v. Everett et al., 111 Pa. Superior Ct. 302, sustaining the validity of an act of assembly requiring a registration certificate from the department of welfare for anyone undertaking to solicit funds for charitable, religious, and other purposes:

"The State [by the 14th Amendment] may not arbitrarily interfere with private businesses or prohibit lawful occupations or impose unreasonable restrictions upon them. This does not prevent a state from exercising its police power in an endeavor to protect its citizens from imposition and fraud."

Defendant has raised the further objection that the Act of 1937, supra, is a local and special law, in violation of article III, sec. 7, of the State Constitution, because by its terms it applies only to "cities of this Commonwealth and in boroughs having a population of more than two thousand five hundred inhabitants". The argument is made that because the act does not apply to a borough

having a population of 2,500 inhabitants, but applies to one having a population of 2,501 inhabitants, it is on that account unconstitutional. An apt answer to that contention is found in the language of Mr. Justice Mitchell in Commonwealth v. Moir, 199 Pa. 534, 545, answering a similar contention against the validity of the Act of March 7, 1901, P. L. 20, known as the ripper bill, being "An act for the government of cities of the second class", as follows:

"No argument, for example, could be more plausible than that there is no real difference in municipal needs, between a city of 99,000 and one of 100,000 population. It is a sufficient answer that the line must be drawn somewhere, and the legislature must determine where."

The learned justice goes on to say that so long as the legislation is not drawn with reference to irrelevant or wholly local matters, the courts have no authority to interfere. The courts recognize that classification is oft-times necessary to escape from the intolerable inconveniences of uniformity of regulations under circumstances and needs essentially different: Wheeler et al. v. Philadelphia et al., 77 Pa. 338.

The legislature, in passing the act under consideration, had a reasonable basis for considering that the evils sought to be corrected could hardly exist in small boroughs of less than 2,500 inhabitants. There is little opportunity for the perpetration on a gullible public of such frauds which the act seeks to minimize, in small communities in which people are more or less known to each other, and where there is the daily opportunity for the people therein to observe what is going on. No merchant in such a small place could conduct a so-called "going out of business" sale, and during its progress have new merchandise delivered to him for stacking up his shelves, without being readily detected by his fellow-townsmen.

It was entirely proper for the legislature not to burden business people in such small places with the cost of li-

censes for such sales, or put additional burdens upon the administrative officers of such small places with the duties incident thereto. The evils intended to be cured by the act under consideration are naturally to be found in more populous centers where there is greater opportunity for unscrupulous competition with little opportunity on the part of the public to detect it. The legislature has the power to group together as a class communities or public bodies which, by reason of similarity of circumstances and requirements, will have their public interest best served by similar regulations: Commonwealth v. Gilligan, 195 Pa. 504.

We do not consider this act in any sense special or local legislation. Where the obvious purpose of the legislation is wholesome as this is, to protect the citizens of the State against fraudulent practices, being State-wide in its application, excepting for the smaller communities referred to, the courts will not be astute to find reason for striking it down. Every borough, as and when its population passes 2,500 inhabitants, automatically comes within the terms of the act. Therefore, no community may be said to be permanently excluded from its benefits.

We hold that the act offends neither the constitutional restrictions referred to, nor the liberalizing opinions of our appellate courts which have construed it: The City of Wilkes-Barre v. Meyers, 113 Pa. 395. In Bennett et al. v. Norton et al., 171 Pa. 221, 236, the court said, referring to the Meyers case, in which the act of assembly there under consideration provided for enlarging the civil jurisdiction of the justices of the peace, "except in cities of the first class", that that case "shows the extent to which the courts will go to sustain an act of the legislature, which, perhaps in letter, but not in its true intent and meaning, violates the constitutional provision against special legislation". See also Perkins et al. v. Philadelphia et al., 156 Pa. 539, Pittsburg's Petition, 32 Pa. Superior Ct. 210, Seabolt et al. v. The Commissioners of Northumberland County, 187 Pa. 318, Commonwealth ex rel. v.

Middleton, 210 Pa. 582, and Commonwealth ex rel. v. Heller, 219 Pa. 65.

We now come to a consideration of the facts before us in the case. In his application for a license to conduct what the applicant referred to therein as a "going out of business" sale defendant stated that the true name of the owner of the goods offered for sale and the name of the operator of the sale was Blaylock & Blynn, Inc. That this was a misrepresentation of fact in violation of the act is evident when the agreement between Blaylock & Blynn, Inc., and Harry Wolf (defendant in a companion case) dated February 1938, and appearing in the record, is considered. The agreement provided that the corporation, in consideration of the sum of $15,000, agreed to sell to the said Wolf in bulk all the assets of the corporation, consisting of its stock of goods and fixtures situate at its place of business, 1702 Walnut Street, Philadelphia; that Wolf was to conduct the business of the corporation until June 15, 1938, in the name of the corporation; that he was to completely stock the store of the corporation, and to keep the store so stocked during the period of the sale. Herein may be found the scheme to mislead, cheat, and defraud the public by the use of the name of a time-honored concern which had gotten into other hands.

Every one understands that a "going out of business" sale or a "closing out" sale implies that the merchant is selling at sacrifice prices the stock of merchandise which he has on hand, and under the guise of such a sale the merchant is not warranted in replenishing his stock with additional merchandise so as to keep on foisting it upon the public as though it were part of the stock of goods which the merchant is sacrificing by "closing out" or "going out of business".

According to the proofs here, the reputable name and goodwill of Blaylock & Blynn, Inc., was used to foist upon the public through the subterfuge of a "going out of business" sale goods purchased by Wolf from manufacturers with whom Blaylock & Blynn had never dealt before, and

whose goods they had never before handled, but for the purposes of the "sale" carried the label of "Blaylock & Blynn".

Following the granting of the license, extensive advertisements appeared in the daily press under the name of Blaylock & Blynn, in which such statements as the following were made: "Entire stock of Blaylock & Blynn to be sold for a fraction of its worth during the 'going out of business' sale. Nothing reserved. Every item is original Blaylock & Blynn stock."

Though defendant had stated to the city treasurer before the license was granted that Wolf was not promoting the sale, it was perfectly apparent that he was, because it was he who made purchases of new merchandise to palm off on the public as "original" stock of Blaylock & Blynn from concerns with which Blaylock & Blynn had never had any dealings, or whose goods they had never handled or sold to the public.

It is illuminating to learn from the record in this case how easily and effectively a gullible and unsuspecting public may be taken advantage of through such so-called "going out of business" or "closing out" sales; it emphasizes the need for such legislation as we have under consideration, and indeed it emphasizes the need for more effective application of such legislation.

A bookkeeper for Blaylock & Blynn, Inc., reading from records of bills for merchandise put into the sale and charged either to one Finklestein or Wolf in care of Blaylock & Blynn, testified that for the months of May and June of 1938 the purchases totaled $34,000 and $26,000, and the sales totaled $55,000 and $58,000 for the same months. He stated that the goods were marked up from the cost price to a supposed original price and then reduced to the sales price. For instance, the total cost for clothing was $24,000 and the marked-up price was $41,-000. On men's hats the total cost price was $913 and the marked price was $3,141. Total haberdashery cost was $7,000 and the marked price was $14,000. Defendant ad-

mitted that the merchandise marked with two prices included goods received after May 10th.

We do not deem it necessary to go into further details concerning the transaction, which may be found in the record, excepting to add that one of the clothing dealers who had never sold any clothing to Blaylock & Blynn stated that he had sold to Wolf after May 10th for delivery to the Blaylock & Blynn store approximately $25,000 worth of clothing, tropicals ranging from $14.75 and $16.75 to $19.25, most of them being at $16.75. The same witness stated that he recognized his suits advertised in the so-called "going out of business" sale as "were $55, now $29.75", a palpably false and fraudulent statement, because these suits had never before been handled by Blaylock & Blynn.

That defendant actively participated in this fraud is clear. It was he who made the application to the city treasurer for the license to conduct a "going out of business" sale, and it was he who thereafter coöperated with defendant Wolf, in the companion case, in perpetrating the fraud on the public in making misrepresentations in connection with the goods offered for sale under the license granted.

Whether the revocation of license was proper so that defendant's offense was that of conducting such a sale thereafter without a license, or whether we should hold that the city treasurer had no power to revoke the said license after granting it and hold defendant guilty of a violation of the license under the act under which it was granted, the result would be the same. However, in this case the city treasurer had a perfect right to revoke the license.

There is no doubt that the general rule is that where provision is made in a statute for punishment for violation of a license regularly issued there is no right to revoke the license for a subsequent violation unless the right of revocation in such circumstances is specifically authorized. This, however, does not apply to a case in

which the license itself was procured in the first instance by fraud and misrepresentation. The very authority cited on behalf of defendant for the general proposition, after stating it, points this out very clearly. In the cited case, Oleomargarine Licenses, 19 Dist. R. 927, at p. 928, it was stated by Deputy Attorney General Hargest (now president judge of the Common Pleas Court of Dauphin County) :

"It is the settled law, by the trend of authorities in this state and elsewhere, that the power which grants a license has the right to revoke it, where it is obtained by fraud".

The matter before Judge Hargest at the time did not involve a license obtained by fraud, but merely a subsequent violation, and inasmuch as the statute under consideration did not invest the licensing power with authority to revoke and the licensee had not stipulated for such revocation for a subsequent violation, the general rule as stated was applied. However, to give emphasis to the point that that general rule did not apply to a case where the license itself was obtained by fraud, Judge Hargest (then deputy attorney general, as previously stated) concluded his opinion to the Dairy and Food Commissioner with the following statement:

"This opinion in no way conflicts with that of Deputy Attorney-General Fleitz, given to you March 25, 1908, concerning the license to Henry H. Hopper, wherein he upheld your power to revoke because he found 'by the fair weight of the evidence in the case before me, it is clear that the license was obtained by fraud'."

We entertain no doubt that under the evidence in this case the city treasurer had a legal right to revoke the license which had been obtained from him by fraud and for a fraudulent purpose. Otherwise, the lawful authority so imposed upon would have to sit idly by while a continuing fraud was being perpetrated upon the public and be limited to action to enforce penalties under the act which could not be accomplished until long after the

public had been cheated and defrauded. The law cannot be placed in any such weak and ineffective position. After all, the primary purpose of the legislation is the protection of the public against fraud and imposition. Punishment of the wrongdoer is merely secondary and incidental to that main purpose.

The appeal is dismissed, and the fine of $100 heretofore imposed upon defendant is sustained.