Marion Woodward Payne, Sara Wolfe Bell, Lea M. Csala, Frances Phelps Waller, Rachael W. Gutman, Anthony J. Mussari, Barbara B. Albert, Magdalene Dysleski, Stella M. Moat, Elizabeth C. Miner, George Loveland, Esquire, Carolyn H. Reif, Judith L. Reishtein, Anthony J. Walaitis and Stella Walaitis, his wife, and The Wilkes College Students' Committee for a Clean Environment, by Mark Chamberlain, Trustee Ad Litem, Plaintiffs, v. Jacob G. Kassab, Individually and as Secretary of the Pennsylvania Department of Transportation, and The Commonwealth of Pennsylvania Department of Transportation: City of Wilkes-Barre, John B. McGlynn, Mayor, Marjorie Bart, Robert P. Brader, John V. Morris, Kenneth Remensnyder, Con Salwoski, and Joseph A. Williams, Councilmen of the City of Wilkes-Barre, Luzerne County, Pennsylvania, Defendants.

Argued September 10, 1973, before President Judge Bowman and Judges Crumlish, Jr., Kramer, Wilkinson, Jr., Mencer, Rogers and Blatt.

*F. Charles Petrillo,* with him *James F. Geddes, Jr.,* for plaintiffs.

*Edward V. A. Kussy,* Assistant Attorney General, with him *Charles P. Gelso,* Assistant Attorney General, *Robert W. Cunliffe,* Deputy Attorney General, and *Israel Packel,* Attorney General, for defendants.

ADJUDICATION BY JUDGE MENCER, November 21, 1973:

This equity action was initiated by several individual citizens of the City of Wilkes-Barre and a group of students attending Wilkes College in Wilkes-Barre. The named defendants include the Secretary of the

Pennsylvania Department of Transportation, the Commonwealth of Pennsylvania Department of Transportation, the City of Wilkes-Barre, and the Mayor and Councilmen of the City of Wilkes-Barre. The complaint filed seeks to enjoin the widening of portions of North and South River Streets in Wilkes-Barre.

Under the proposed plans, River Street would be widened to a forty-two-foot four-lane artery for a distance of approximately two-thirds of a mile. As a consequence, there would be an encroachment up to twelve feet at certain points and the taking of approximately one-half acre from lands known as the River Common (Common). Some large trees would be removed and a pedestrian walk would be eliminated.

The Common is presently comprised of about twenty-two acres and is essentially a park area. The original "town plot" of Wilkes-Barre was laid out in 1770 by settlers of the Susquehanna Company who migrated to the Wyoming Valley from the Connecticut Colony. An area along the Susquehanna River was left open and became known as the River Common. During the past two centuries this land has been used for various public events, and historical monuments have been erected on the Common. In 1779 it was the site of encampment of the Clinton-Sullivan Expedition against warring elements of the Iroquois Nation.

In 1806 the Borough of Wilkes-Barre was incorporated and in 1807 the Pennsylvania Legislature dedicated the Common lands between South Street and Union Street for use as a public common. In 1846 the Legislature dedicated the land from Union Street northward to North Street as a public common. The Luzerne County Courthouse is located at the north end of the Common.[1] Kings and Wilkes Colleges are located on

---

[1] The authority of the City of Wilkes-Barre to grant to the County of Luzerne the right to build a courthouse on the north

the east side of River Street, and students from those institutions use the park area of the Common.

The defendants filed answers, and an evidentiary hearing was held for four days in December 1972. At the completion of this hearing, certain of the defendants made a motion to dismiss. The parties have presented briefs and offered oral argument before this Court en banc. Upon consideration of the evidence, we make the following

## Findings of Fact

1. The plaintiffs in this action in equity are Marion Woodward Payne, Sara Wolfe Bell, Lea M. Csala, Frances Phelps Waller, Rachael W. Gutman, Anthony J. Mussari, Barbara B. Albert, Magdalene Dysleski, Stella M. Moat, Elizabeth C. Miner, George Loveland, Esquire, Carolyn H. Reif, Judith L. Reishtein, Anthony J. Walaitis and Stella Walaitis, his wife, all of whom are residents and taxpayers in the City of Wilkes-Barre, Luzerne County, Pennsylvania, and its environs, and the Wilkes College Students' Committee for a Clean Environment, an unincorporated association of Wilkes College students comprising a school sanctioned club at Wilkes College in the City of Wilkes-Barre, Luzerne County, Pennsylvania.

2. The defendants are Jacob G. Kassab, individually and as Secretary of the Pennsylvania Department of Transportation, the Commonwealth of Pennsylvania Department of Transportation, the City of Wilkes-Barre, and John B. McGlynn, Mayor, Marjorie Bart, Robert P. Brader, John V. Morris, Kenneth Remensnyder, Con Salwoski, and Joseph A. Williams, Coun-

---

portion of the public common was the source of prolonged and bitter legal controversy. *See Bennett v. Norton*, 171 Pa. 221, 32 A. 1112 (1895) ; *Mahon v. Norton*, 175 Pa. 279, 34 A. 660 (1896) ; *Mahon v. Luzerne County*, 197 Pa. 1, 46 A. 894 (1900) ; and *Gumpert v. Hay*, 202 Pa. 340, 51 A. 968 (1902).

cilmen of the City of Wilkes-Barre, Luzerne County, Pennsylvania.

3. The action is in the nature of a class action and was brought to enjoin the widening of portions of North and South River Streets in the City of Wilkes-Barre, insofar as the widening project proposed by the defendants encroaches upon lands known as the River Common of the City of Wilkes-Barre.

4. The Pennsylvania Department of Transportation, also called PennDOT, under the Act of May 6, 1970, P. L. 356, §§11-18, as amended, 71 P.S. §§511-521, has certain powers and duties, including those formerly vested in the Pennsylvania Department of Highways, that encompass the planning and developing of transportation programs and the building, rebuilding, maintenance, widening and construction of State designated highways and rights of way.

5. The City of Wilkes-Barre is a third class city of the Commonwealth of Pennsylvania duly incorporated pursuant to the Act of May 4, 1871, P. L. 539, of the Pennsylvania Legislature, and operating in accordance with the Third Class City Code, Act of June 23, 1931, P. L. 932, 53 P.S. §35101 et seq., and under the provisions as well of the Optional Third Class City Charter Law, Act of July 15, 1957, P. L. 901, 53 P.S. §41101 et seq., all as amended.

6. Dating from about the year 1770, when the original town of Wilkes-Barre was plotted out by settlers of the Susquehanna Company from Connecticut Colony, there has existed a tract of land bordering the Susquehanna River at Wilkes-Barre, consisting originally of approximately thirty-five acres and dedicated and used as a public common.

7. In 1799, while Wilkes-Barre was still a township, the Legislature of the Commonwealth of Pennsylvania, in order to resolve conflicting claims between Pennsylvania and Connecticut settlers and to legalize titles to lands in the area involved, which included the

then township of Wilkes-Barre, passed an act entitled "An Act for offering compensation to the Pennsylvania claimants of certain lands within the Seventeen Townships in the county of Luzerne, and for other purposes therein mentioned." Act of April 4, 1799, recorded in Law Book Vol. VI, 394, 3 Sm.L. 362.

8. On January 2, 1804, commissioners appointed under the Compensation Act of April 4, 1799, and its supplements, made and returned a survey and issued a certificate to the "township committee," at that time comprised of Matthias Hollenback, Lord Butler, and Jesse Fell, for two tracts of land in the township of Wilkes-Barre, "one thereof being a square in the town plot thereof and called the Centre Square and the other being the public common on the river bank," and the latter embracing the entire river front from North Street to South Street; which two tracts contained about "thirty-nine acres and forty-one perches, with the usual allowance of six percentum for roads."

9. By the Act of March 17, 1806, recorded in Law Book Vol X, 326, 4 Sm.L. 321, the Borough of Wilkes-Barre was incorporated by the Legislature of the Commonwealth.

10. By Section III, Act of April 9, 1807, recorded in Law Book Vol. XI, 47, 4 Sm.L. 411 (a supplement to the Act of April 4, 1799), the Pennsylvania Legislature dedicated that portion of the River Common along the river front between South and Union Streets for use as a public common in the following manner: "And be it further enacted by the authority aforesaid, That all that certain tract of land fronting the town-lots in the borough of Wilkes-Barre, on the bank of the Susquehanna, extending from the land of Jebez Fish, up the said river, one hundred and ninety-two rods, in a line parallel with the front line of the town-lots, be, and the same hereby is granted and set apart as a public common, and to remain as such for ever."

11. By the Act of March 28, 1846, P. L. 196, §6, the Pennsylvania Legislature provided: "That all that certain tract of land, fronting the town lots in the borough of Wilkes-Barre, on the bank of the Susquehanna River, extending from the north side of Union street, up the said river, about sixty three rods to the north side of North street, be and the same hereby is granted and set apart as a public common, and to be under the control and jurisdiction of the town council of said borough."

12. By Articles of Agreement made February 8, 1869, and recorded in Luzerne County Deed Book 141 at page 276, and by Indenture made May 16, 1870, and recorded in Luzerne County Deed Book 141 at page 278, the Trustees of the Properties of the Borough and Township of Wilkes-Barre, successors to the former Township Committee, did convey the two tracts of land, being the Public Square and the River Common, to the Burgess and Town Council of the Borough of Wilkes-Barre.

13. By patent issued from the Land Department of the Commonwealth of Pennsylvania on January 10, 1870, and recorded in Luzerne County Deed Book 170 at page 240, and upon the payment of the sum of $207.-39, the two tracts of land, namely the Public Square and Public Common (River Common), were granted to the Burgess and Town Council of the Borough of Wilkes-Barre.

14. The Borough of Wilkes-Barre became an incorporated city of the Commonwealth of Pennsylvania pursuant to the Act of May 4, 1871, P. L. 539.

15. Prior to 1971, the Commonwealth of Pennsylvania, Department of Highways and/or PennDOT, commenced studies and planning for the widening of Legislative Route Spur 5, which encompasses North and South River Streets in the City of Wilkes-Barre between North and South Streets in that municipality,

and on April 20, 1971, a public hearing was conducted with reference to the project at which only two proposals for widening were made to the public—one which would not encroach upon River Common lands on the westerly side of the street, and one which would encroach upon the River Common lands as well as lands of property owners on the easterly side of the street.

16. The proposal recommended by PennDOT would widen North and South River Streets to a four-lane traffic artery, forty-two feet in width, for a distance of approximately two-thirds of a mile, taking lands from both the easterly and westerly (River Common) sides of the street.

17. River Street is a multilane roadway which passes through the River Common along its eastern side as well as beyond the limits of the park in both a northerly and southerly direction. It varies from three to four lanes along the length of the Common. At South Street, River Street is forty-six feet six inches wide, tapering to forty-two feet in width five hundred feet north of South Street. It is at this point that the proposed project will commence. The existing street continues to gradually narrow down to thirty-two feet at Market Street. North of Market, River Street is thirty feet wide until it gradually widens to thirty-eight feet six inches at North Street. This allows for four lanes of traffic between South Street and Northampton Street and three lanes of traffic for the remainder of the distance.

18. River Street is bordered by tree-lined sidewalks on both sides, and a tree lawn is between these sidewalks and River Street. The trees in both of these tree lawns are in variable conditions. Surveys were made in June of 1970 and again in December of 1972. These surveys showed the trees directly affected by the project:

| | | Condition of Trees | | | |
|------|-------------|------|------|------|------|
| Year | Total Trees | Good | Fair | Poor | Dead |
| 1970 | 23 | 10 | 5 | 4 | 4 |
| 1972 | 20 | 10 | 5 | 3 | 2 |

The trees affected were of the following varieties, by the 1970 survey:

| Tree | Good | Fair | Poor | Dead |
|------|------|------|------|------|
| Elm | 4 | 3 | 1 | 3 |
| Norway Maple | 4 | | | |
| Silver Maple | | 2 | | |
| Horse Chestnut | 2 | | 2 | |
| Basswood | | | 1 | |

As indicated, the 1972 survey showed three trees had been cut; of these two were dead elms and one was the basswood listed in poor condition in 1970.

19. The River Common is twenty-one and seven-tenths acres in size and contains numerous walkways and grass lawns abutted by many trees and plants. The limits of the Common are from North Street to South Street and from the Susquehanna River to the property line on the east side of River Street. Within its boundaries are several historical markers and monuments.

20. On the west side of River Street, the side of the River Common, the following significant structures and features may be found: On the corner of North Street and River Street is the front of the Luzerne County Courthouse, with a cement sidewalk and steps leading to the Courthouse. The cement sidewalk continues in a southerly direction to the tracks of the Wyoming Valley Railroad Company. An earthen driveway to the rear of the Courthouse is immediately adjacent to the tracks. Three large trees and the ends of several paths leading into the Common lie just south of the tracks. The sidewalk becomes a cinder walkway for the rest of the length of the project. A low stone

wall divides the area of the cinder walk from the rest of the Common for most of the remaining length of the project. At Market Street, the stone wall terminates and the cinder walk broadens and merges with the sidewalk of the Market Street bridge. Granite railing borders the sidewalk area in the vicinity of this intersection. These facilities are paralleled on the south side of the bridge, where the stone wall begins again. A one-story building with flood protection equipment lies just south of the bridge. The stone wall terminates just south of Northampton Street and there is no divider for the remainder of the Common.

21. On the west side of River Street, there is a concrete sidewalk throughout. North Street, Jackson Street, the railroad tracks, West Union Street, Market Street, Northampton Street, and South Street intersect with River Street. Between North Street and Jackson Street, Luzerne County maintains a parking lot. Kings College lies south of Jackson Street. Various properties, with well established front lawns continue to a point just north of Market Street. At that point, there is a medium-sized hotel (the Hotel Sterling). A gasoline station is on the south side of the intersection. For the remaining length of the project, most of the buildings are residential type structures, many owned by Wilkes College. A Baptist Church lies just south of the Market Street intersection.

22. River Street is now and will continue to be the major access route to the bridges across the Susquehanna River between Wilkes-Barre and the Borough of Kingston.

23. River Street is now and will continue to be an essential link in the transportation system of Wilkes-Barre and Luzerne County.

24. The River Street project has been established as having a high priority by the Lackawanna-Luzerne County Transportation Study which is the official pro-

jected transportation study of the area. This study considered all aspects of growth and development in the area and then proposed a transportation system sufficient to meet projected needs. The study has been developed through the cooperation of state and local officials, as well as other local participants. It is the result of extensive analysis by professional planners at state and local levels.

25. The Wilkes-Barre City Council, after consideration and reconsideration, approved the project, but, as indicated by a resolution of July 6, 1971, said approval was conditioned upon acceptance by PennDOT of certain recommendations which included, *inter alia,* repairing all telephone poles and wires with underground wires and total reconstruction of River Street.

26. On November 5, 1971, notice was filed that PennDOT had given approval to the Legislative Route 5 Spur (River Street) widening project; and on November 12, 1971, a "finding" was filed that stated in effect that there would be some adverse effect on the River Common park lands but that there was no feasible alternative.

27. In recent times the River Common has been used as an open space and park area; festivals and civil programs are held there; and students from local colleges use the area for study, classes, and recreation.

28. The historical development of the park indicates that the River Common is an area of local historical significance.

29. Two proposals for straightening and realigning River Street were evolved; one would balance the taking on *both* sides of River Street, and the other would take a small amount on the east side of River Street and primarily take from the west side of River Street. The former was "Scheme II," while the latter was labeled "Scheme I" at the public hearing of April 20, 1971.

30. Scheme I was adopted for straightening and realigning River Street.

31. The Commonwealth is removing twenty-three trees of variable quality but replacing them with twenty-eight trees of a quality and size reasonably compatible with transplanting.

32. The cinder walkway and tree lawn between this walkway and the pavement will remain of substantially the same character as that which presently obtains.

33. The parapet and railing along the Market Street bridge will be rebuilt with original material in those areas where the change in the curve requires the moving of the parapets.

34. The stone wall between the Common and the walkway will have to be moved at some locations, but will be rebuilt with existing material. In addition, the wall sustained some damage as a result of the June 1972 flood, and the Department has agreed to make the necessary repairs in conjunction with the project.

35. Granite curbing will be used along the edges of paving to improve the appearance of River Street.

36. Two short stone pillars near the railroad tracks with historical markers will be affected by the construction and will be moved slightly further into the Common. The original material will be retained. There is no historical significance to the specific location of these pillars.

37. The Department of Transportation did consult with the Departments of Environmental Resources, Community Affairs, and Health, the State Planning Board, and the Fish Commission, regarding the location, design, construction or reconstruction of the River Street project, and their suggestions and criticisms were considered.

38. In addition to a required public hearing, held April 20, 1971, officials of the Department of Trans-

portion met with individual citizens and groups of citizens on numerous occasions to explain and answer questions on the project.

39. The transcript of the public hearing was analyzed and commented upon by the District Office subsequent to the public hearing. This analysis, as well as the transcript itself, was before the Secretary of Transportation when the Secretary reached his decision to approve construction of the River Street project.

40. The Secretary of Transportation issued his finding, which was published in the Pennsylvania Bulletin and local newspapers, that no feasible and prudent alternative existed and that the project as planned incorporated appropriate environmental safeguards.

41. Since the area was of local historical significance, the Pennsylvania Historical and Museum Commission was consulted. The Department was notified that, after the investigation, the Commission was satisfied with the project.

42. The Department of Transportation did cooperate with other authorities and agencies in the development of the River Street project. The Commonwealth has coordinated this project with the Luzerne County Planning Commission, the Lackawanna-Luzerne Transportation Study, the Wilkes-Barre Redevelopment Authority, the County of Luzerne, and the City of Wilkes-Barre (through the Planning Commission, the Recreation Department, the City Engineer, the City Planner, and the City Council). Numerous changes, suggestions, and even the initial request for the project, were derived from one or more of the foregoing agencies.

43. The nature of River Street will remain substantially the same, and the project will not significantly alter the River Common.

44. The City of Wilkes-Barre has approved the present project.

### Discussion

The River Common is an area of local historical significance and is within the purview of Section 13 of the Act of May 6, 1970, P. L. 356 (Act 120), as amended, 71 P.S. §512, and Article I, Section 27 of the Pennsylvania Constitution. Two important questions confront us in this case.

## I

### THE EFFECT OF ARTICLE I, SECTION 27 OF THE PENNSYLVANIA CONSTITUTION ON THE RIVER STREET PROJECT

Article I, Section 27 of the Pennsylvania Constitution states: "The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people."

In *Commonwealth v. National Gettysburg Battlefield Tower, Inc.*, 8 Pa. Commonwealth Ct. 231, 302 A. 2d 886 (1973), *aff'd* 454 Pa. 193, 311 A. 2d 588 (1973), we held the provisions of this section to be self-executing.[2] Here, plaintiffs urge us to read Article I, Section 27 in absolute terms. Since, admittedly, an historical area will be affected by a widening of River Street, they assert their rights under this section of the Pennsylvania Constitution are violated and the highway project in question must be enjoined.

---

[2] In the Supreme Court's affirmance, by a 5-2 decision, four Justices expressed their views on the question of whether the provisions of Article I, Section 27 of the Pennsylvania Constitution are self-executing, and they were equally divided on this point. The three other Justices of the Court did not express opinions on this question but supported the affirmance on other considerations.

This Court's awareness of the ramifications of such an absolute interpretation caused us to point out in *Gettysburg* that "[i]t is difficult to conceive of any human activity that does not in some degree impair the natural, scenic and esthetic values of any environment. If the standard of injury to historic values is to be that expressed by the Commonwealth's witnesses as an 'intrusion' or 'distraction,' it becomes difficult to imagine any activity in the vicinity of Gettysburg which would not unconstitutionally harm its historic values." *Id.* at 249, 302 A. 2d at 895.

Likewise, it becomes difficult to imagine any activity in the vicinity of River Street that would not offend the interpretation of Article I, Section 27 which plaintiffs urge upon us. We hold that Section 27 was intended to allow the normal development of property in the Commonwealth, while at the same time constitutionally affixing a public trust concept to the management of public natural resources of Pennsylvania. The result of our holding is a controlled development of resources rather than no development.

We must recognize, as a corollary of such a conclusion, that decision makers will be faced with the constant and difficult task of weighing conflicting environmental and social concerns in arriving at a course of action that will be expedient as well as reflective of the high priority which constitutionally has been placed on the conservation of our natural, scenic, esthetic and historical resources.

Judicial review of the endless decisions that will result from such a balancing of environmental and social concerns must be realistic and not merely legalistic. The court's role must be to test the decision under review by a threefold standard: (1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources? (2) Does the record demonstrate

a reasonable effort to reduce the environmental incursion to a minimum? (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?

Applying this standard here, we reach the conclusion that the defendants' motion to dismiss plaintiffs' complaint should be granted.

Our examination of the record discloses that there has been complete compliance with Act 120, the applicable statute. Act 120 prohibits building or expanding any transportation facility involving a public park or an historical site unless there is no feasible and prudent alternative to the use of such land and such facility is planned and constructed to minimize the harm to the park or historical site. The Secretary of Transportation, based on an adequate record, made specific determinations that the River Street project met these criteria. Act 120 also requires that certain agencies having special expertise in the environmental field be consulted in the planning and construction of transportation facilities. The record discloses that such was done on this project. A comprehensive public hearing and publication of findings regarding the project, called for by Act 120, were accomplished. Likewise, the River Street project is part of a comprehensive plan and local officials were consulted in the development of the plans, as required by the Act. Finally, the record shows that the Commonwealth gave consideration to the effects of the River Street project on the twenty-three items enumerated in Section 13(b) of Act 120, as amended, 71 P.S. §512(b).[3] We note that the Commonwealth did follow,

---

[3] Section 13(b) reads:

"Upon the submission of the preliminary plan or design to the Department of Transportation for any transportation route or

as required by Act 120, the hearing procedures required by the Federal Government for Federal-aid transportation programs. However, there is no requirement that

program requiring the acquisition of new or additional right-of-way, the Department of Transportation except in cases involving complaint proceedings under the jurisdiction of the Public Utility Commission shall have the power and its duty shall be to follow the hearing procedures now or hereafter required by the Federal Government for Federal-aid transportation programs pursuant to Titles 23 and 49 of the United States Code as amended and the regulations and procedures thereunder even though the transportation route or program does not contemplate the use of or actually employ Federal funds. At the hearings required by this subsection the Department of Transportation shall consider the following effects of the transportation route or program:

"(1) Residential and neighborhood character and location;

"(2) Conservation including air, erosion, sedimentation, wildlife and general ecology of the area;

"(3) Noise, and air and water pollution;

"(4) Multiple use of space;

"(5) Replacement housing;

"(6) Displacement of families and businesses;

"(7) Recreation and parks;

"(8) Aesthetics;

"(9) Public health and safety;

"(10) Fast, safe and efficient transportation;

"(11) Civil defense;

"(12) Economic activity;

"(13) Employment;

"(14) Fire protection;

"(15) Public utilities;

"(16) Religious institutions;

"(17) Conduct and financing of government including the effect on the local tax base and social service costs;

"(18) Natural and historic landmarks;

"(19) Property values;

"(20) Education, including the disruption of school district operations;

"(21) Engineering, right-of-way and construction costs of the project and related facilities;

"(22) Maintenance and operating costs of the project and related facilities;

the Commonwealth do more than adhere to the Federal procedural requirements applicable to the conduct of hearings. We must on this record conclude that the Commonwealth did comply with the requirements of Act 120 which is the statute applicable here.

Next, the record establishes the reasonable effort that will be expended to reduce the adverse environmental consequences of the project to a minimum. The replacement of trees, the relandscaping of affected areas, the use of special materials, such as granite curbing, the reuse where possible of existing materials, the preservation of the Courthouse steps, the relocation of historical markers, and the protection of the Common during construction are record examples of such effort which we deem reasonable under the circumstances of this case.

Finally, the record discloses that an important, favorable, and major change will occur in the movement of traffic in the area of the Common with only a physical taking of between two percent and three percent of the land making up the Common. Further, this land taking will be an extension or widening of the existing roadway and not a new intrusion at a location critical

---

"(23) Operation and use of existing transportation routes and programs during construction and after completion.

"At the hearings required by this section, the public officials named in clause (15) of subsection (a) of this section shall make a report indicating the environmental effects of the proposed transportation route or program. The Department of Transportation shall not construct or reconstruct any portion of the transportation route or program unless the Secretary of Transportation makes a written finding published in the Pennsylvania Bulletin that:

"(1) No adverse environmental effect is likely to result from such transportation route or program; or

"(2) There exists no feasible and prudent alternative to such effect and all reasonable steps have been taken to minimize such effect. For the purpose of this subsection environmental effect shall refer to the effects enumerated in this subsection."

to the enjoyment and use of the Common. We hold that the environmental harm and adverse effect of the River Street project on public natural resources are clearly outweighed by the public benefits to be derived from the project.

More significantly, we find that the River Street project is not constitutionally impermissible under the provisions of Article I, Section 27 of the Pennsylvania Constitution.

## II

### HAVE PAST LEGISLATIVE DEDICATIONS OF THE RIVER COMMON PREVENTED PRESENT STRAIGHTENING AND WIDENING OF RIVER STREET

Since the Common extends in an easterly direction to the property line on the east side of River Street, it follows that River Street has been and is now part of the Common. We are satisfied that a reasonable and minimal widening and improvement of River Street is allowable because such a project is not inconsistent with the original grant that encompassed River Street. In *Commonwealth v. Connellsville Borough*, 201 Pa. 154, 160, 50 A. 825, 826 (1902), the rule was stated that "[t]he adaptation and use of the ground for one or more public purposes, and its regulation accordingly, are within the discretion of the public authorities so long as they do not transgress the terms or limitations of the original grant."

In *Bernstein v. Pittsburgh*, 366 Pa. 200, 77 A. 2d 452 (1951), this rule was followed, and a city was permitted to lease a public outdoor auditorium in a public park to an opera company. In *Shields v. Philadelphia*, 405 Pa. 600, 176 A. 2d 697 (1962), part of a public park was converted into a Little League baseball field, and this was held not to be an undue departure from the original grant for a public park.

In the instant case, the widening of River Street does not alter the character and nature of the Common. The road project does not violate the original grant, since the Common's present features will be retained. We do not have here a taking of public property for private purpose but merely a diversion of a minimal quantum of public land from one public purpose to another public purpose.

We do not find the dedication statutes to have been violated relative to the River Street project. Therefore, we do not consider whether or not Act 120 or the Act of June 1, 1945, P. L. 1242, 36 P.S. §670-101 et seq., granting the Commonwealth broad powers in regard to maintaining and improving streets, implicitly repealed the restrictive covenants of the dedication statutes. *See Interstate Cemetery Company Appeal,* 422 Pa. 594, 222 A. 2d 906 (1966).

Plaintiffs' contention that the approval of the City Council of Wilkes-Barre is not valid since it was a conditional approval is without merit. The City Planner and the City Engineer of Wilkes-Barre testified at the hearing and expressed satisfaction with the cooperation the Commonwealth has given the City, and their testimony clearly indicated the City's approval of the project. From the evidence we have specifically found as a fact that the City of Wilkes-Barre has approved the project.

One further matter requires only brief attention. The record does not support the plaintiff's assertion that the Pennsylvania Historical and Museum Commission was not consulted. The correspondence between this Commission and the Department of Transportation which was admitted into evidence establishes just the contrary of plaintiffs' contention in this regard. Any remaining question as to this matter was removed by the testimony of Edward F. LaFond, Jr., Keeper of the Pennsylvania Register of Historic Sites and Land-

marks, whose testimony was conclusive as to the Commonwealth's position on this point, although he was called as a witness for the plaintiffs.

Accordingly, we make the following

## Conclusions of Law

1. The River Common area of the City of Wilkes-Barre is an area with natural, scenic, historic and esthetic values within the contemplation of Article I, Section 27 of the Pennsylvania Constitution.

2. Article I, Section 27 of the Pennsylvania Constitution is a self-executing provision in accordance with doctrines of public trust and represents a proper exercise of state powers within the scope of the Ninth Amendment to the United States Constitution.

3. The plaintiffs in this action have standing as part of the public and as owners of property fronting the Common to object to the appropriation of part of the Common for highway purposes.

4. The defendant, the Commonwealth of Pennsylvania Department of Transportation, has complied with all relevant provisions of the Act of May 6, 1970, P. L. 356, §13, as amended, 71 P.S. §512, in respect to the River Street project in Wilkes-Barre, Pennsylvania.

5. The defendants, Pennsylvania Department of Transportation and City of Wilkes-Barre, are not precluded from utilizing or taking any portion of the River Common for the purposes of highway or road construction or widening by Article I, Section 27 of the Pennsylvania Constitution.

6. The expansion or widening of a legislative route spur for general and commercial traffic is a proper use of common lands within the meaning of the term "public common" and a use not prohibited by the State Legislature in its acts of dedication of the River Common area of the City of Wilkes-Barre.

7. The defendant, the Commonwealth of Pennsylvania Department of Transportation, has complied with the Act of March 4, 1970, P. L. 117, §1, 71 P.S. §716 (j), in that it has properly consulted the Pennsylvania Historical and Museum Commission on the design and location of the River Street widening project.

8. The City of Wilkes-Barre, Pennsylvania, has given sufficient and necessary legal approval in connection with the River Street project.

9. The proposed reconstruction and widening project will not result in an improper and unlawful diversion of use of the Wilkes-Barre River Common lands contrary to acts of the Pennsylvania Legislature and the Pennsylvania Constitution.

10. Plaintiffs' equity suit should be dismissed.

DECREE NISI

AND Now, November 21, 1973, motion of defendants, the Commonwealth of Pennsylvania Department of Transportation and the City of Wilkes-Barre, to dismiss plaintiffs' complaint is hereby granted, and plaintiffs' complaint is hereby dismissed, at the cost of the plaintiffs. The Prothonotary shall enter this Decree Nisi and notify the parties, or their counsel, forthwith. If no exceptions hereto are filed within twenty (20) days after the notice of filing hereof, this Decree Nisi shall be entered by the Prothonotary as a final decree.

———

CONCURRING OPINION BY PRESIDENT JUDGE BOWMAN:

Again, this Court is confronted with the difficult question of determining whether the provisions of Article I, Section 27, of our Constitution are self-executing. In *Commonwealth v. National Gettysburg Battlefield Tower, Inc.*, 8 Pa. Commonwealth Ct. 231, 302 A. 2d 886 (1973), *aff'd* 454 Pa. 193, 311 A. 2d 588 (1973), we were not unanimous on this issue. It was my view by

concurring opinion that the issue did not have to be met in that case.

In this case I fully concur with the result reached by the majority. However, being now squarely faced with the issue here, I must express my view that said provisions are not self-executing for the reasons stated by Mr. Justice O'BRIEN in the Opinion of the Court and as amplified by Mr. Justice ROBERTS in his Concurring Opinion, affirming this Court in *Gettysburg*.

CONCURRING OPINION BY JUDGE WILKINSON:

I fully concur with the result reached by the majority in the disposition of this case. It is not necessary, however, for this Court to reach and decide the difficult and important question of whether or not the provisions of Article I, Section 27, of the Pennsylvania Constitution are self-executing. I, therefore, would omit Conclusion of Law No. 2.