**ENERGY CONSERVATION COUNCIL
OF PENNSYLVANIA, Petitioner**

v.

**PUBLIC UTILITY COMMISSION,
Respondent.**

**Irwin A. Popowsky, Consumer
Advocate, Petitioner**

v.

**Public Utility Commission, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 6, 2011.

Decided July 11, 2011.

Willard R. Burns, Marianna, for petitioner Energy Conservation Council of Pennsylvania.

Shaun A. Sparks, Harrisburg, for petitioner Office of Consumer Advocate.

Michael L. Swindler, Harrisburg, for respondent.

David B. MacGregor, Philadelphia, for intervenor PPL Electric Utilities Corporation.

BEFORE: McGINLEY, Judge, and BUTLER, Judge (P.), and FRIEDMAN, Senior Judge.

OPINION BY Judge BUTLER.

Energy Conservation Council of Pennsylvania (ECC) and the Office of Consumer Advocate (OCA) petition for review of the February 12, 2010 and April 23, 2010 orders of the Public Utility Commission (PUC) granting the Applications of PPL Electric Utilities Corporation (PPL) at Docket Nos. A–2009–2082652, A–2009–2082832, A–2009–2088297, A–2009–2088337, A–2009–2088327, A–2009–2088340, A–2009–2088312, A–2009–2088360 to construct a new 500 kV transmission line and substation in Pennsylvania.[1] The

1. An application to exercise eminent domain across the property of Max Bohleman, at Docket No. A–2009–2088331, was withdrawn pursuant to an order issued April 14, 2009.

issues before this Court are whether the PUC committed errors of law, acted arbitrarily and capriciously, violated Article I, Section 27, of the Pennsylvania Constitution, and/or abused its discretion by approving the proposed line and accompanying facilities, and by allowing construction to begin on the proposed line before a permit is received from the National Park Service for the Wallenpaupack to Bushkill segment. Based upon the following, we affirm the orders of the PUC.

ECC is a Pennsylvania non-profit organization consisting of over 1,600 members dedicated to energy conservation, and to the preservation of the natural beauty, historical sites, and the rural and agricultural character of the Commonwealth. PPL is a public utility and electric distribution company that supplies electricity in eastern and central Pennsylvania under the PUC's jurisdiction. PPL is a member of PJM Interconnection, L.L.C. (PJM), which is a regional transmission organization approved by the Federal Energy Regulatory Commission (FERC) charged with ensuring the reliability of the electric utilities transmission system, and coordinating the movement of wholesale electricity in all or parts of 13 states and the District of Columbia, including most of Pennsylvania and New Jersey. FERC adopted the North American Electric Reliability Corporation (NERC) as the electric reliability organization for the United States, many of whose standards are mandatory for regional transmission organizations, such as PJM, and their members, like PPL.

PJM annually prepares a regional transmission expansion plan (RTEP) using complex computer modeling or load flow studies to analyze the electric supply needs of customers in its region. PJM uses load deliverability tests (which examine defined load zones in PJM's region and considers the ability of the transmission system to deliver adequate power to the load zone during a generation capacity emergency) and generator deliverability tests (which evaluate the capability of the transmission system to assure resources can be delivered to the remainder of the PJM system during peak load). PJM is required to apply certain NERC reliability standards to its planning process over the short (years 1 to 5) and long-term (15 years). If PJM identifies NERC criteria violations, it must develop and implement solutions to mitigate them, or suffer penalties. Each year, PJM also reviews previously-approved transmission plans in order to determine whether they are still required, and whether they are required in the year originally identified. This is referred to as retooling.

PPL performs independent analyses of its bulk electric system transmission facilities under PJM's control, in addition to its non-bulk electric system transmission facilities. It provides the results of its studies to PJM for consideration for its RTEP process. PPL's planning guidelines are consistent with PJM's criteria and, in some cases, are more stringent. As a result, PPL may recommend reinforcements and additional projects.

PJM's 2007 and 2008 RTEPs identified the need for a new line between Pennsylvania and New Jersey, because forecasts reflected that transmission facilities in Pennsylvania would be overloaded by early 2013 (i.e., loading on the transmission facilities was projected to exceed applicable ratings, which may cause permanent dam-

Applications to exercise eminent domain across the properties of the Chaudri Family Limited Partnership, David Murphy and Marguerite T. Kranick, at Docket No. A–2009– 2088337, and Kenneth and Linda Powell, at Docket No. A–2009–2088359, were withdrawn pursuant to an order issued July 2, 2009.

age to transmission infrastructure and widespread power outages). The 2008 RTEP specifically identified twenty-three NERC Category A and B (single contingency) violations projected to occur beginning in 2012,[2] and twenty-seven NERC Category C5 (double circuit; lower probably event) violations.[3] Accordingly, PJM directed PPL and Public Service Electric & Gas Company (PSE & G) to construct a new line by June 1, 2012. PPL submitted three transmission line alternatives to PJM (no non-transmission alternatives were proposed). A retool study completed by PJM in March of 2009 reduced the number of potential Category A and B reliability issues from twenty-three to thirteen, and the Category C5 violations from twenty-seven to ten. Because it had the greatest positive impact over a 15–year planning horizon, PJM chose the 500 kV Susquehanna–Roseland transmission line, the Pennsylvania portion of which would consist of approximately 101 miles that will run through portions of Lackawanna, Luzerne, Monroe, Pike and Wayne counties (proposed line).[4]

On January 6, 2009, PPL filed an application with the PUC for authorization to construct the proposed line, part of which would result in the necessary modernization of the approximately 28–miles of the 80–year–old Wallenpaupack to Bushkill 230 kV transmission line, which must take place either as part of this project or as a separate project. Consolidated with that application was PPL's request for authorization to construct a new substation in Blakely Borough, Lackawanna County, to connect the 500 kV line to the regional transmission system in that area. PPL also filed applications for determination that the proposed exercise of eminent domain over five tracts of land is necessary for the service, accommodation and convenience or safety of the public. The applications were, likewise, consolidated. Notice of the applications was published.

Public hearings were scheduled based upon a request of the OCA and letters from two Pennsylvania state legislators. Notices of appearance were entered by OCA, the Office of Trial Staff (OTS). Petitions to intervene were granted for Winona Lake Property Owners Association,[5] UGI Utilities, Inc. (UGI), Pennsylvania American Water Company (PAWC),[6] Exelon Generation (Exelon), PPL Industrial Customer Alliance (PPLICA), and Donna

2. Nineteen of the twenty-three violations would occur in the Roseland area of New Jersey; four of the violations would occur in Pennsylvania. According to OCA, only one violation involved a contingency condition overload on a 500 kV transmission line, projected to occur in 2019.

3. According to the record, the Category C5 issues were identified then, but were inadvertently omitted by PPL as to the proposed line until August of 2009.

4. It will begin in Susquehanna Substation in Salem Township, Luzerne County, proceed north and then east to the Delaware river, then cross into New Jersey to PSE & G's Roseland Substation. The complete line will be approximately 146 miles long. Ninety-seven miles of the proposed line will be located in existing rights-of-way and along the paths of existing transmission lines. It will cross 698 deeded properties. New rights-of-way will be needed from approximately 50 property owners. The total estimated cost is $1.2 billion; the cost of the Pennsylvania portion is estimated at $510 million. It is estimated that PPL customers will pay approximately 5%, or $60 million of the total project cost.

5. By order issued April 14, 2009, a petition for leave to withdraw was granted as to Winona Lakes Property Owners Association.

6. PAWC withdrew from the case by letter dated August 31, 2009.

Davis, Esquire.[7] Protests were filed by ECC[8] and the Saw Creek Estates Community Association, Inc. (SCECA) and various individuals. Two hearings were held on March 20, 2009.

On April 2, 2009, pursuant to a prehearing order issued by the PUC, PPL amended its application to reflect rerouting. Due to public interest, public hearings were held on May 21, 2009 (18 individuals offered testimony) and July 2, 2009 (21 individuals offered testimony). The PUC issued protective orders on June 8 and July 8, 2009, in response to PPL's unopposed motions.

Evidentiary hearings were held before an administrative law judge (ALJ) on September 1, 2, 4, 8, 9 and 10, 2009. On November 12, 2009, the ALJ issued a recommended decision granting PPL's application to construct the proposed line subject to certain conditions, finding that the exercise of eminent domain is necessary, and finding that construction of the substation in Blakely Borough is reasonably necessary. The ALJ recommended the following conditions for the project:

6. ...

A. That [PPL] replace or repair any damage to homes, residences, other buildings or property caused by the construction of this project.

B. That [PPL] comply with any and all restrictions on the permits received from any agency or entity from which a permit is required in order to construct this project.

C. That where possible, archeological resources identified in the transmission line corridor, in the direct path of access roads or at locations of proposed work areas will be avoided by relocation of structures, rerouting of access roads and reconfiguring and relocating of work areas consistent with agreements between [PPL] and the Pennsylvania Historic and Museum Commission and the Bureau of Historic Preservation protocols.
D. That [PPL] will follow protocols for cultural resource studies for the proposed ... [l]ine project that have been agreed upon with the Pennsylvania Historic and Museum Commission and the Bureau of Historic Preservation. Any identified archeological sites that may be adversely affected will require an evaluation of eligibility for inclusion in the [National Register of Historic Places]. Any curation of artifacts would be coordinated with the State Historic Preservation Office.
E. That [PPL] will provide adequate advance notice to the [SCECA] and each Saw Creek resident whose property is burdened by the transmission line right-of-way of when construction will be performed within the Saw Creek Estates, including when a helicopter may be used. A copy of the notice will be served upon the [PUC]'s Bureau of [Conservation Economic and Energy Planning (CEEP) ].
F. That [PPL] will develop a plan to educate communities located along the proposed route regarding the construction, the mitigation efforts to be used to

---

7. By Initial Decision issued April 16, 2009, a late-filed petition by Lehman Township to intervene was denied, and the late-filed protest of Lackawanna River Corridor Association and the Lackawanna Valley Conservancy was dismissed. By order issued June 12, 2009, the PUC reversed the ALJ's dismissal of the late-filed protest of Lackawanna River Corridor Association and the Lackawanna Valley Conservancy based upon a concern about adequacy of its notice of the proceeding.

8. ECC filed an amended protest on May 4, 2009, after PPL's motion to strike its original protest was granted.

ensure the safety of the citizens and property, and to provide basic information regarding line features, which shall be served upon the [OCA], [OTS], [ECC] and [SCECA] as well as the [PUC]'s Bureau of CEEP and Office of Communications within sixty days of the final Order in this matter.

7. That the request of [PPL] to replace the 230 kV line from Wallenpaupack to Bushkill in kind is granted but construction shall not commence until [PPL] has obtained or been denied all approvals necessary for construction of the [proposed line].

8. That the approvals granted in this Order shall expire unless construction of the projects commences within two years of the entry date of the [PUC]'s Order[.]

ECC Br., App. C at 296–297. Exceptions to the recommended decision were filed by PPL, OCA, OTS, SCECA and ECC. Replies to exceptions were filed by PPL, OCA, SCECA and ECC.

On January 14, 2010, the PUC adopted a final opinion and order,[9] subsequently entered on February 12, 2010, that adopted the ALJ's recommendations but added the following condition:

G. That [PPL] shall within 30 days of the release of [PJM]'s next update to the 2008 [RTEP], or a new baseline RTEP report, file a report with [the PUC] at this docket regarding PJM's latest findings regarding the forecasted reliability contingencies this project is intended to address. [PPL] shall identify whether it intends to defer its construction schedule, and if necessary, identify any needed revisions to the relief granted by the [PUC] in this proceeding.

ECC Br., App. A at 142–144. The PUC also stated more specifically that construction of the Wallenpaupack to Bushkill line "shall not commence until [PPL] has obtained the National Park Service permit for the portion of the line through the Delaware Water Gap Recreation Area [DEWA]," and that the approvals will expire within three years from the date of the order.

On March 1, 2010, OCA filed a petition for reconsideration or clarification of the PUC's February 12, 2010 order relative to the permits and authorizations necessary for the commencement of construction. Specifically, the OCA stated that the PUC's order was unclear as to whether PPL could begin construction on any part of the proposed line in Pennsylvania, other than the Wallenpaupack to Bushkill segment, before the National Park Service reaches a decision on the federal permit necessary for PPL to cross the DEWA. The PUC granted reconsideration of its order pending its review of the merits but, by order issued on April 23, 2010, ultimately denied OCA's request that it reinstate the ALJ's recommendation relating to the National Park Service permit issue, since conditioning the commencement of construction on PPL's receipt of a National Park Service permit for the DEWA would result in a significant, unacceptable delay in light of the demonstrated need for the line by 2012.

■ ECC filed a petition for review with this Court on May 14, 2010 at Docket No. 899 C.D. 2010.[10] On May 21, 2010,

9. Vice Chairman, Tyrone J. Christy, dissented, stating that, because the record before the PUC was out-of-date, he would have denied the application without prejudice and encouraged PPL to reevaluate the need for the proposed line.

10. "Appellate review of a PUC order is limited to determining whether a constitutional violation, an error of law, or a violation of PUC procedure has occurred and whether necessary findings of fact are supported by substantial evidence." *Popowsky v. Pa. Pub.*

OCA filed a petition for review at Docket No. 951 C.D. 2010. On May 24, 2010, SCECA filed a petition for review at Docket No. 969 C.D. 2010, but its appeal was discontinued on August 19, 2010. By order of this Court issued July 22, 2010, the remaining appeals were consolidated at Docket No. 899 C.D. 2010. PPL and OCA intervened. By letter dated April 13, 2011, pursuant to Condition 7(G) of the PUC's February 12, 2010 order, PPL supplied to the PUC PJM's 2010 RTEP. On June 3, 2011, ECC filed an application for relief in which it asked this Court to remand this proceeding for a further evidentiary hearing and determination as to the need for the proposed line or, alternatively, to allow the record on appeal to be supplemented with the 2010 RTEP.

ECC first argues on appeal that the PUC committed errors of law, acted arbitrarily and capriciously, violated Article I, Section 27, of the Pennsylvania Constitution, and/or abused its discretion by approving the proposed line despite the fact that PPL did not evaluate any non-transmission alternatives and did not update its 2007 evaluation of transmission alternatives to respond to the reliability issues identified in its 2008 RTEP or its March 2009 modeling study which it relied upon to support its position that the proposed line is still needed. We disagree.

■ Section 1501 of the Public Utility Code (Code) provides, in pertinent part: Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public. Such service also shall be reasonably continuous and without unreasonable interruptions or delay. Such service and facilities shall be in conformity with the regulations and orders of the [PUC]. Subject to the provisions of this part and the regulations or orders of the [PUC], every public utility may have reasonable rules and regulations governing the conditions under which it shall be required to render service.

66 Pa.C.S. § 1501. The PUC's regulations specifically provide:

(e) At hearings held under this section, the [PUC] will accept evidence upon, and in its determination of the application it will consider, *inter alia,* the following matters:

(1) The present and future necessity of the proposed HV line in furnishing service to the public.

(2) The safety of the proposed HV line.

(3) The impact and the efforts which have been and will be made to minimize the impact, if any, of the proposed HV line upon the following: (i) Land use. (ii) Soil and sedimentation. (iii) Plant and wildlife habitats. (iv) Terrain. (v) Hydrology. (vi) Landscape. (vii) Archeologic areas. (viii) Geologic areas. (ix) Historic areas. (x) Scenic areas. (xi) Wilderness areas. (xii) Scenic rivers.

(4) The availability of reasonable alternative routes.

52 Pa.Code § 57.75(e). Any decision by the PUC as to the environmental impact of

*Util. Comm'n,* 589 Pa. 605, 622, 910 A.2d 38, 48 (2006).

On March 15, 2010, ECC had filed a petition for review of the PUC's February 12, 2010 order at Docket No. 373 C.D. 2010. On March 26, 2010, upon PPL's motion, the appeal was stricken pursuant to Pa.R.A.P. 1701(b)(3), in light of OCA's then-pending petition for reconsideration.

HV lines must be set against the backdrop of Article I, Section 27, of the Pennsylvania Constitution, which states:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, § 27. In *Payne v. Kassab*, 11 Pa.Cmwlth. 14, 312 A.2d 86 (1973), *aff'd*, 468 Pa. 226, 361 A.2d 263 (1976), this Court held:

> [Article I,] Section 27 [of the Pennsylvania Constitution] was intended to allow the normal development of property in the Commonwealth, while at the same time constitutionally affixing a public trust concept to the management of public natural resources of Pennsylvania. The result of our holding is a controlled development of resources rather than no development.
>
> We must recognize, as a corollary of such a conclusion, that decision makers will be faced with the constant and difficult task of weighing conflicting environmental and social concerns in arriving at a course of action that will be expedient as well as reflective of the high priority which constitutionally has been placed on the conservation of our natural, scenic, esthetic and historical resources.
>
> Judicial review of the endless decisions that will result from such a balancing of environmental and social concerns must be realistic and not merely legalistic. The court's role must be to test the decision under review by a threefold standard: (1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources? (2) Does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?

*Id.*, 312 A.2d at 94. These factors were codified in Section 57.76(a) of the PUC's Regulations which state:

> The Commission will issue its order, with its opinion, if any, either granting or denying the application, in whole or in part, as filed or upon the terms, conditions or modifications, of the location, construction, operation or maintenance of the line as the Commission may deem appropriate. The Commission will not grant the application, either as proposed or as modified, unless it finds and determines as to the proposed [high voltage (HV)] line:
>
> (1) That there is a need for it.
>
> (2) That it will not create an unreasonable risk of danger to the health and safety of the public.
>
> (3) That it is in compliance with applicable statutes and regulations providing for the protection of the natural resources of this Commonwealth.
>
> (4) That it will have minimum adverse environmental impact, considering the electric power needs of the public, the state of available technology and the available alternatives.

52 Pa.Code § 57.76(a). Each factor "must be proven by a preponderance of the evidence. A preponderance of the evidence means only that one party has presented evidence that is more convincing, by even the smallest amount, than the evidence presented by the other party." *Energy Conservation Council of Pa. v. Pub. Util.*

*Comm'n,* 995 A.2d 465, 478 (Pa.Cmwlth. 2010) (citation omitted).

▇▇▇ Each of the PUC's findings must be based upon substantial evidence. "Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Phila. Gas Works v. Pa. Pub. Util. Comm'n,* 898 A.2d 671, 675 n. 9 (Pa.Cmwlth.2006). The Pennsylvania Supreme Court has held:

> The standard of review to be applied by the Commonwealth Court when reviewing the PUC is that the court should not substitute its judgment for that of the PUC when substantial evidence supports the PUC's decision on a matter within the commission's expertise. The court itself has said: Our duty is to determine only whether or not the PUC's findings are supported by substantial evidence; we may not substitute our judgment for that of the PUC, nor may we 'indulge in the processes of weighing evidence and resolving conflicting testimony.'

*Popowsky v. Pa. Pub. Util.,* 550 Pa. 449, 457, 706 A.2d 1197, 1201 (1997).

> A capricious disregard of evidence exists when there is a willful and deliberate disregard of competent testimony and relevant evidence which one of ordinary intelligence could not possibly have avoided in reaching a result. The meaning of arbitrary includes founded on prejudice or preference rather than on reason or fact.

*Casne v. Workers' Comp. Appeal Bd. (Stat Couriers, Inc.),* 962 A.2d 14, 19 n. 5 (Pa. Cmwlth.2008) (quotation marks and citation omitted). The capricious disregard standard requires more than the mere fact that the Commission reaches a different conclusion than that argued by the proponent of the evidence. *Popowsky.*

▇▇▇ ECC contends that the proposed line was allegedly needed as a result of the 2007 RTEP, but that PPL's application relies on the 2008 RTEP, which identified different reliability issues than the 2007 RTEP. Now PPL claims that the proposed line is needed based upon the 2009 retool which again identified materially different reliability issues. Yet, the only alternatives to the proposed line examined by PJM were considered in 2007. Since that time, no one has determined whether a cheaper or less intrusive alternative exists.

ECC further contends that the 2009 retool study eliminated the only NERC violations involving a 500 kV transmission line identified in the 2008 RTEP and, of the 13 remaining violations, 10 involved overloads that could occur in 2019, and which could be addressed by simply reinforcing the existing 230 kV line, which is less expensive and less intrusive. Despite having determined that the potential future issues identified in the 2009 retool are less severe than those in the 2007 and 2008 RTEPs, no up-to-date study has been conducted to see whether the violations can be further reduced, particularly in light of the fact that the 2009 retool study used a vintage, rather than peak load, forecast, which does not account for the severe downturn in the economy. Accordingly, ECC argues that the PUC erred by finding that the alternatives evaluated by PPL in 2007 were adequate to address reliability issues identified in 2009, particularly since PPL's evaluation failed to include non-transmission alternatives and alternatives to the electric reliability issues identified in the March 2009 study.

The ALJ and, consequently, the PUC noted that Section 57.76(a)(4) of the PUC's regulations refers to "*the* available alternatives", not "*all* available alternatives," and that the phrase specifically refers to adverse environmental impact. Even if the phrase did not specifically modify just the "adverse environmental impact" criteria, a

June 1, 2012 deadline makes the examination of every possible alternative impossible. Moreover, the record reflects that PPL provided significant information and documentation as to 30 transmission line alternatives considered as a result of the 2007 RTEP. Steven Herling, PJM's Vice President of Planning, testified that PPL in fact evaluated non-transmission alternatives, which included market-driven additions of new generation capacity and demand side management resources located in the eastern part of PJM's region. Since, however, the problems with the current line are considered to be transmission-based, it was proper that the alternatives were, likewise, transmission-based. Three were evaluated side-by-side by PJM, and the proposed line was deemed the best. That determination has been reevaluated and updated, and it has withstood the 2008 RTEP evaluation, the 2009 retool study and PJM's 2010 RTEP, with integrated changes.

Finally, the PUC met its obligations under Article I, Section 27, of the Pennsylvania Constitution. The PUC considered whether PPL complied with statutes and regulations for the protection of natural resources; it made a reasonable effort to keep environmental incursion to a minimum; and, any harm to the environment would be outweighed by its benefits. The record reflects that PPL conducted significant siting studies, and it specifically adopted criteria for siting the proposed line where it would have minimal impact on the natural environment and would minimize crossing of natural resource lands, forests, parks, wildlife management areas and designated game, wildlife and conservation areas. It examined photographs, maps and federal, state and county government geographic and nature conservancy studies. Routes were developed in accordance with the National Park Service and the Office of Appalachian Trail guidelines. Field inspections were conducted. PPL presented evidence of its efforts to minimize and mitigate any environmental impact. Specifically, among the alternative sites, the proposed line will have the least impact on land use because it can use existing transmission facilities, and will need fewer rights-of-way. Fewer acres of land and vegetation will have to be cleared, so there will be less disturbance to wildlife and minimized risk of erosion or sedimentation. Finally, significant evidence as to the effects of electric and/or magnetic fields was examined and determined to have minimal effect, particularly in light of PPL's proposed mitigation efforts.

Based upon the foregoing, there was substantial evidence to support the PUC's determination that PPL considered available alternatives prior to preparing and filing its application consistent with the PUC's regulations and the establishment of the "need." The PUC did not, therefore, commit errors of law, act arbitrarily or capriciously, violate Article I, Section 27, of the Pennsylvania Constitution, and/or abuse its discretion by approving the proposed line.

This Court has stated:

> [T]he PUC's interpretations of the Code, the statute for which it has enforcement responsibility, and its own regulations are entitled to great deference and should not be reversed unless clearly erroneous. When reviewing a PUC decision, the Court should neither 'substitute its judgment for that of the PUC when substantial evidence supports the PUC's decision on a matter within the commission's expertise,' nor should it indulge in the process of weighing evidence and resolving conflicting testimony.

*Energy Conservation Council of Pa.*, 995 A.2d at 478 (citation omitted). Relative to this particular issue, this Court stated:

'it is settled law that the designation of the route for [a HV] line [is] a matter for determination by [a utility's] management in the first instance, and [the utility's] conclusion will be upheld unless shown to be wanton or capricious.' Thus, where the record establishes that the utility's route selection was reasonable, considering all the factors, its route will be upheld. The mere existence of an alternative route does not invalidate the utility's judgment.

*Id.*, 995 A.2d at 479–80 (citations omitted). Accordingly, this Court will not disturb the PUC's determination that, consistent with the PUC's regulations and the establishment of the "need," PPL considered available alternatives prior to preparing and filing its application.

ECC next argues on appeal that the PUC committed errors of law, acted arbitrarily and capriciously, violated Article I, Section 27, of the Pennsylvania Constitution, and/or abused its discretion by approving the facilities despite the fact that PPL (1) did not evaluate the May 2009 energy efficiency and demand side resources that cleared PJM's reliability pricing model (RPM) auction and will reduce demand; (2) did not use an updated load forecast in its modeling; (3) failed to evaluate the effects of Pennsylvania's Act 129 and New Jersey's energy master plan peak load reduction initiatives, which require the reduction of peak electrical usage; and, (4) based justification for the siting on Category C5 tests that were improperly conducted. We disagree.

ECC argues that PPL failed to evaluate the May 2009 energy efficiency and demand side resources that cleared PJM's RPM auction, which may reduce further demand. According to the record, however, PPL presented evidence that it evaluated non-transmission alternatives, which included market-driven additions of new generation capacity and demand side management resources located in the eastern part of PJM's region. In addition, PPL stated that the demand response and energy efficiency resources will be modeled in the next retool, but they will not affect the types of violations the proposed line must address (PJM determined that sufficient demand response and energy efficiency resources would be unlikely to entirely offset the need for additional transmission capability in the densely developed metropolitan areas), so that would not change the required in-service date for the proposed line.

ECC also argues that the PUC's order was in error because the RTEP process upon which PPL's application is based failed to use an updated load forecast, thereby failing to account for future reductions in demand due to the economic recession. However, the record reflects that PJM did update the load forecast information during the 2009 retool, which affirmed the need for the proposed line as early as 2012, despite a decline in electrical load as a result of the current economic circumstances. Moreover, the PUC's order conditioned the construction of the proposed line upon future RTEP analysis continuing to demonstrate a need for the line in order to resolve NERC violations.

ECC further argues that the PUC erred in finding that the proposed line is needed despite the fact that PJM and PPL failed to evaluate the effects of Pennsylvania's Act 129 and New Jersey's energy master plan peak load reduction initiatives, which require the reduction of peak electrical usage. Under those plans, electric distribution companies are to create energy efficiency and conservation programs. According to the record, however, Act 129 is recently-enacted legislation that has not yet been implemented and the effects of which are unknown, particularly since it is

voluntary; and, it focuses on measures to aid customers with high electricity prices, rather than transmission planning.

Finally, ECC argues that the test that showed the Category C5 issues were not properly conducted and load shedding could resolve potential Category C5 issues, so Category C5 violations cannot form the basis for the siting of the proposed line. The PUC determined, however, based upon the evidence presented, that the 2009 retool study properly tested for Category C violations, that operator-initiated load shedding is not permitted in response to NERC Category C5 violations, and that the demand response and energy efficiency resources to be modeled in the next retool study will not affect the Category C violations, so it would not change the 2012 in-service date.

Based upon the foregoing, the PUC did not commit errors of law, act arbitrarily or capriciously, violate Article I, Section 27, of the Pennsylvania Constitution, and/or abuse its discretion by approving the proposed line.

ECC next argues on appeal that the PUC committed errors of law, acted arbitrarily and capriciously, violated Article I, Section 27, of the Pennsylvania Constitution, and/or abused its discretion by approving the proposed facilities without properly finding that they keep environmental incursion to a minimum or are reasonably responsive to the need that exists. The ECC cites *Re: Pennsylvania Power & Light*, 50 Pa. P.U.C. 480 (1977), and *Re: West Penn Power Co.*, 54 Pa. P.U.C. 319 (1980), to support this proposition. We disagree.

ECC argues that since the proposed line is "clearly bigger than it needs to be to deal with the alleged reliability issues," it is not reasonably responsive to the need that exists, and thus the PUC erred by granting PPL's application. ECC Br. at 63. However, there is no requirement in the PUC's regulations or any case law binding upon this Court that the PUC must specifically find that the proposed line will be "reasonably responsive to the need that exists." It is not clear where in *Re: Pennsylvania Power & Light*, 50 Pa. P.U.C. 480 or *Re: West Penn Power Co.*, 54 Pa. P.U.C. 319, the PUC declares that in order to be legally sufficient, its orders must declare that a proposed line is "proportionate" to the need, and/or "reasonable in scope." Even if that were the case, ECC's position would be to allow the proposed line to have no more capacity than what is required to resolve the NERC violations. The proposed line indeed has additional capacity over resolving the NERC violations. However, PPL demonstrated that the large number of violations required a robust solution, in order to provide sufficient capacity and operational flexibility to insure future reliability of the electric grid; otherwise, facilities would have to be continuously upgraded, which is against sound transmission planning and does not accommodate future growth. The PUC also determined that the proposed line is in the public interest since it will resolve reliability criteria violations and, in conjunction with other RTEP projects, will help ensure reliable service to customers in PJM and PPL transmission zones; it is expected to reduce congestion costs; the new Lackawanna substation will improve voltage; it will modernize the old Wallenpaupack–Bushkill segment at less cost than as a stand-alone project; it will eliminate existing stability limits imposed in areas of high density generation; and, it will provide economic benefits to the local communities in the form of jobs and additional tax revenues.

It is clear that Section 57.76(a)(4) requires that the PUC find, in light of the public's needs, the state of available tech-

nology and available alternatives, the proposed line will have "minimum adverse environmental impact." The criteria set forth in *Payne* requires that this Court determine, *inter alia*, whether the record demonstrates a reasonable effort to reduce the environmental incursion to a minimum. ECC's claim notwithstanding, the PUC did that in this case. As established above, the PUC considered and decided that PPL made a reasonable effort to keep environmental incursion to a minimum. Because there is substantial evidence to support the PUC's determination that PPL's construction of the proposed line will have minimum adverse environmental impact, considering the electric power needs of the public, the state of available technology and the available alternatives, ECC's argument on this point is without merit.

■ Finally, ECC and OCA argue on appeal that the PUC committed errors of law, acted arbitrarily and capriciously, and/or abused its discretion by allowing construction to begin on the proposed line before a permit is received from the National Park Service for the Wallenpaupack to Bushkill segment. We disagree. Part of the proposed line will result in the necessary modernization of the approximately 28-miles of the Wallenpaupack to Bushkill 230 kV transmission line, which must take place, whether as part of this project or as a separate project. According to the record, however, making the necessary upgrades during the construction of the proposed line will be less costly than making the upgrades as a separate project. The PUC's orders depart from the ALJ's recommendation and permit PPL to begin construction of the proposed line before it obtains a permit from the National Park Service for work on the Wallenpaupack to Bushkill segment through the DEWA. According to ECC and OCA, the process of obtaining a permit from the National Park Service is underway. The National Park Service is currently preparing an environmental impact study (EIS) in order to evaluate the request. The National Park Service has stated that its final EIS and decision is not anticipated until the fall of 2012.

ECC and OCA argue that the PUC erred by granting approval of PPL's application without requiring that all federal and state approvals be obtained prior to beginning construction. However, there is nothing in the PUC's siting regulations that requires the receipt of all necessary permits before construction of the proposed line begins. Moreover, the PUC fully examined the evidence presented on this issue, the ALJ's recommendation, and the parties' exceptions. Ultimately, the PUC disagreed with the ALJ's condition that PPL obtain all necessary permits prior to commencing construction of the proposed line. The PUC agreed with PPL that there is no record to support such a condition; the line must be replaced in that area regardless of the construction of the proposed line since it is 80 years old and in a greatly deteriorated condition; and, construction of the proposed line must commence as soon as possible in order to meet the June 1, 2012 in service deadline. The PUC also agreed with PPL that requiring PPL to wait for the National Park Service permit improperly injects the PUC into managing utility planning and construction of transmission projects, particularly since the PUC has no jurisdiction over lands within a national park. In addition, the PUC determined that, even if the subject permit were not obtained, no portion of that segment of the proposed line will have to be modified and no investment will have been wasted. Finally, the PUC stated that prior PUC proceedings for the siting and construction of transmission lines do not support a condition that con-

struction may not commence until all permits for the line are obtained.

■ "The [PUC], not the ALJ, is the ultimate factfinder in proceedings before it and must resolve conflicts in testimony as well as weigh the evidence presented." *Duquesne Light Co. v. Pa. Pub. Util. Comm'n,* 163 Pa.Cmwlth. 367, 643 A.2d 130, 135 (1994). Accordingly, "an ALJ's decision may always be overruled based upon contrary findings by the PUC if the PUC's findings are based on substantial evidence." *Pa. Power Co. v. Pa. Pub. Util. Comm'n,* 155 Pa.Cmwlth. 477, 625 A.2d 719, 726 (1993). Therefore, it is the PUC's review of the evidence that must prevail here.

Because there was substantial evidence to support the PUC's finding on this issue, the PUC did not commit errors of law, act arbitrarily and capriciously, and/or abuse its discretion by allowing construction to begin on the proposed line before a permit is received from the National Park Service for the Wallenpaupack to Bushkill segment.

Based upon the foregoing, we hold that the PUC did not commit errors of law, act arbitrarily and capriciously, violate Article I, Section 27, of the Pennsylvania Constitution, and/or abuse its discretion by approving PPL's application to construct a new 500 kV transmission line and substation in Pennsylvania, or by allowing construction to begin on the proposed line before a permit is received from the National Park Service for the Wallenpaupack to Bushkill segment. Therefore, the February 12, 2010 and April 23, 2010 orders of the Public Utility Commission are affirmed.

### ORDER

AND NOW, this 11th day of July, 2011, the February 12, 2010 and April 23, 2010 orders of the Public Utility Commission are affirmed. Additionally, the application for relief filed by Energy Conservation Council of Pennsylvania to supplement the record on appeal to include the 2010 regional transmission expansion plan issued by PJM Interconnection, L.L.C. is granted.